### DAVIS and others *vs.* SHIELDS.

A note or memorandum of a contract for the sale of chattels, to be va-
lid within the provisions of the Revised Statutes, must be *subscribed* by
the party to be charged thereby: i. e. *the name of the party must be signed
below or at the end of the memorandum.* What, under the old statute, was
deemed sufficient as a *signing*, is not a compliance with the statute requir-
ing a *subscribing*.

It was formerly held, that the mere mention in a note of sale of the name
of the party sought to be charged, was a valid signing within the act. It
of course is no longer sufficient to bind the parties.

Where a contract is made by a broker, and no sale-note is delivered, and
the entry by him made in his sale book *varies* from the contract as actu-
ally concluded, neither party is bound, inasmuch as no note or memoran-
dum of the *contract* has been reduced to writing: thus, when a contract is
made for a quantity of iron expected from abroad, and the *purchaser* stip-
ulates for *six months credit,* and for the arrival of the iron in a *reasonable
time,* and the broker omits to make an entry of those conditions, the *ven-
dors* are not bound, although the conditions primarily were for the bene-
fit of the *purchaser* and he elects to waive them.

Whether, if the condition as to *reasonable time* had been reduced to writing,
and the iron had not arrived in *double the usual time,* either party could
have compelled performance by the other—*quere ?*

To render a contract valid under the statute, it is enough that the note or
memorandum be subscribed by the party sought to be charged thereby, or
by his authorized agent; it is not necessary that *both* parties should sub-
scribe.

ERROR from the Supreme Court. Shields brought an
action of assumpsit in the superior court of the city
of New-York, for the non-delivery of a quantity of iron
purchased by him of Davis and others. The purchase was
made on 31st January, 1836, of a *broker* of the defendants,
of fifty tons of English iron *at* $70, *per ton,* at a credit of
six months, the iron to be in good order, and the plaintiff
not to be bound to take it unless it arrived *in reasonable
time.* The iron was shipped in England on board the brig
*Anna,* and the invoice and bill of lading dated 30th Octo-
ber, 1835, were received by the defendants on the 4th *De-
cember;* but the brig did not arrive in New-York until
sometime between the 15th and 25th *April,* 1836. The

price of iron then had advanced *to* $98 *per ton*, On the 27th April the plaintiff tendered $3,500 to the defendants and demanded the iron, which they refused to deliver. The broker made a memorandum of the sale in his book, in these words: "Jan. 21st. Sold this day to George W. Shields, on account of Davis and Brooks, fifty tons of English bar iron—say twenty-five tons 1¾ by ½; twenty-five tons 1¾ by ⅝; fifty tons at $70, to arrive on board brig *Anna;* said iron to be in good order or no sale." The broker communicated the sale to the defendants, but no sale note was delivered to either of the parties. The defendants, proved that the usual passages of ships carrying iron varied from thirty to seventy days; that one hundred and seventy days was a long passage, and that they considered the vessel lost. On the trial of the cause the counsel for the defendants insisted that the memorandum of the broker was not a sufficient note of the contract within the statute, 2 *R. S.* 130, § 3, inasmuch as it did not contain the agreement as to the *time of payment,* nor the condition of *arrival in reasonable time,* and was *not subscribed.* The Chief Justice of the superior court charged the jury, that the memorandum of the broker was sufficient, and that the plaintiff was entitled to recover. There were other questions raised on the trial and adverted to in the charge of the Chief Justice, not now necessary to be stated. The defendants counsel excepted to the charge. The jury found a verdict for the plaintiff, on which judgment was entered. The defendants removed the record into the supreme court, where the judgment was *affirmed.* See the opinion delivered in that court, 24 *Wendell* 324, *et seq.* The defendants sued out a writ of error. The case was argued here by:

*D. Lord, Jun.,* for plaintiffs in error.

*J. Taylor* and *D. Selden,* for the defendant in error.

*Points submitted and argued on the part of the plaintiffs
in error:*

I. The memorandum in the broker's book was not a valid contract: it was unauthorized.

1. The contract declared on, is of the class based on the consideration of mutual agreements. In such contracts the agreement on each side, forming the consideration to the other party, must be binding at the date of the contract, or the contract is without consideration, and void. Such contracts, both in justice and in law, rest upon the basis of mutual and reciprocal obligation. *Nichols* v. *Rhynberd, Hobart* 88. *Livingston* v. *Rogers,* 1 *Caines' Rep.* 580. *Burnett* v. *Bisco,* 4 *Johns. R.* 235. *Cook* v. *Oxley,* 3 *Term Rep.* 653. *Payne* v. *Cave,* 3 *T. R.* 148. 1 *Chitty Pleading* 325. *Keep* v. *Goodrich,* 12 *Johns. R.* 397. *Russell* v. *Nicoll,* 3 *Wendell* 120, *Marcy's Opinion. Lawrence* v. *Butler,* 1 *Sch. & Lefroy* 13.

2. The only contract in evidence is the entry in the broker's book, and it cannot be varied or explained by parol evidence. *Peltier* v. *Collins,* 3 *Wendell* 459. *Bailey* v. *Ogden,* 3 *Johns. R.* 411. *Powell* v. *Divett,* 15 *East.* 29. That contract contains no stipulation or condition as to credit, or the time of the arrival of the iron.

3. The authority of the broker, although it may be without writing, must be from each party to sign the identical contract; without such authority from both, the contract is not the mutual obligation of each, and is void. *Cumming* v. *Roebuck,* 1 *Holt* 172; 3 *C. Law Rep.* 65. *Thornton* v. *Kenser,* 5 *Taunton's Rep.* 786. *Peltier* v. *Collins,* 3 *Wendell* 459.

4. The authority of the buyer to the broker was only to sign a contract providing for a credit, and to have a condition of arrival in reasonable time. Had the sellers in this case attempted to enforce the contract, the buyer was clearly not bound by this memorandum, for he never authorized this contract. And the seller did not authorize

the signing of a memorandum, unless it was also authorized by the buyer. This memorandum was therefore void.

5. The entry in the broker's book, (with its deficiencies) never was communicated to the parties. On the arrival of the iron, and the refusal of the sellers to acknowledge the contract, it was too late for the buyer to give it a retro-active effect, by adoption; if that ever can be done with such a class of contracts.

6. No assent of the sellers can, without evidence, be presumed to a contract, because of its terms being advantageous, unless it be first shown to be binding on the other party.

II. The condition of arrival in reasonable time was a material condition, avoiding the contract as to both parties and not at the buyer's option.

1. Where the fault of one party is made the condition of defeating a contract, that is only at the election of the party not in fault. But where the condition is one not resting on the fault of a party, it defeats a contract at the election of either of the parties. *Boyd* v. *Siffkin*, 2 *Campb. R.* 326; *Id.* 327, *note*. *Idle* v. *Thornton*, 3 *Campbell* 274. *Russell* v. *Nicoll*, 3 *Wendell* 112, 120.

2. The non-arrival within reasonable time, was no default of the sellers, nor any breach of promise on their part. It was a collateral event, beyond the control of man, and when happening, freed both, and not holding one bound without fault to the disadvantage of the contract, and exonerating the other. *See* 3 *Campbell* 274. 3 *Wendell* 120. *Hayward* v. *Scougall*, 2 *Campbell R.* 56.

3. The arrival was not, in judgment of law, within reasonable time. Reasonable time had reference to limiting the obligation to abide the changes of the market for the period of a voyage within its ordinary prolongation. Here the vessel had taken her cargo at Bristol, in October, the iron was sold in January, and the arrival late in April.

The buyer could not have been compelled to accept the purchase.

4. The arrival of the whole quantity was also a mutual condition: and if the broker is to be deemed the mutual agent, his knowledge was that the parcel sold to Mr. Shields was only the balance of the shipment of the sizes in question. Mr. Shields was not bound to have accepted the short quantity; nor therefore was the seller bound to deliver it. *Bruce* v. *Pearson*, 3 *Johns. R.* 534. *Russell* v. *Nicoll*, 3 *Wendell*, 112.

III. The broker's entry in his book was not a memorandum of the contract subscribed by the parties to be charged thereby. 2 *R. S.* 70, 136, § 3.

1. The entry is not, in its formation, a memorandum for the signature or use of the parties; it was merely an entry for the business purposes of the broker, and not of the principals. *Hicks* v. *Whitmore*, 12 *Wendell*, 550.

2. The statute making a special and express provision for sales by auctioneers, (equally agents of both parties as brokers,) evinces a clear purpose to exclude the constructive signing by mere broker's entries in their own books: a mode of authentication contrary to the policy and object of the statute. 2 *R. S.* 70, 136, § 4. See *McComb* v. *Wright*, 4 *Johns. Ch. R.* 663, as to auctioneer's entries.

3. The alteration in the old statute, by changing *signing* for *subscribing*, was intended to introduce a more specific and safe mode of authentication than what a loose construction had given to the term *signing*. The change was introduced in reference to a recognized difference in the terms. 2 *R. S.* 70, 136, § 3, compared with 1 *R. L.* 1813, 79, § 15. *Reviser's Notes*, 3 *R. S.* 2d ed. 656, 7, (§ 8 as to *land* differs.) *Merritt* v. *Clason*, 12 *Johns. R.* 102. Compare *Parker* v. *Wilson*, 15 *Wendell*, 346, with 10 *Wendell R.* 250, *Rogers* v. *Kneeland*.

4. A writing in the body of a contract was held to be a signing in analogy to the use of the word, as adjudged, in the statute of frauds as to wills. The alteration and de-

1841.

Davis
*v.*
Shields.

finition in the statute of frauds as to wills, is *in pari materia* to govern the alteration in the statute of frauds as to contracts. See *Statute as to Wills*, 1 *R. L.* 1813, *p.* 364, § 2. 2 *R. S.* 7, 63, § 40. 3 *R. S.* 627. *Revsier's Notes. Cases on signing of wills. Viner Ab. Devise, N. 7, pl.* 2. *Lemayne* v. *Stanley,* 3 *Lev.* 1. *As to Contracts. Hatton* v. *Gray,* 2 *Ch. Cas.* 164, 168. *Knight* v. *Crockford,* 1 *Esp. R.* 190. *Coles* v. *Trecothic,* 9 *Vesey, p.* 248. *Saunderson* v. *Jackson,* 2 *Bos. & P.* 238.

5. The course of decision on the Revised Statutes as to contracts required to be in writing, has been uniformily, excepting in this case, upon a strict and not latitudinarian construction. The words of the statute ought to be construed literally and not metaphorically. See *Downs* v. *Ross,* 23 *Wend.* 272. *Parker* v. *Wilson,* 15 *Wend.* 346. *Hicks* v. *Whitmore,* 12 *Wend.* 548.

*Points submitted and argued on the part of the defendant in error:*

I. There was a sufficient contract in writing, proved in the court below, to bind the plaintiffs in error, under the provisions of the statute of frauds, and parol evidence was inadmissable to contradict it.

II. Even if sufficient iron of the sizes mentioned in the contract did not arrive, (which does not appear,) to answer all the contracts the plaintiffs in error had made, yet if sufficient arrived to meet the contract with defendant in error, the plaintiffs in error were bound to deliver it, or are liable for the non-delivery, they being estopped by their own contract from saying they had made other contracts which they were bound to discharge; they should have stipulated in the contract for the contingency. The engagement being positive, and the delivery to be when arrived, the words " to arrive," in the contract are of the nature of a warranty, and when the goods were shipped, no subsequent event or contingency could discharge the plaintiffs in error.

III. The question of reasonable time cannot arise under this contract, a period having been agreed upon between the parties when the property was to be delivered, to wit, when it arrived.

IV. If reasonable time as to this contract is implied by law, then it was not necessary to insert it in the memorandum; and the non-insertion cannot impair the contract, for the rights of the parties are sufficiently protected. If the question of reasonable time can be raised, then the time between the date of contract and arrival of the vessel and iron, is not an unreasonable time, and the plaintiffs in error must stand charged.

V. The iron arrived in good order, as established by the evidence and verdict, and this condition was for the benefit of defendant in error, and he has considered it in good order.

VI. The measure of damages was not the price at which the defendant in error had contracted to sell some of the iron, to wit, $80 per ton.

After advisement, the following opinions were delivered:

By the CHANCELLOR. This case involves a construction of the statute of frauds, or that section of the act which requires certain agreements for the sale of goods, or things in action, to be in writing and to be subscribed by the person to be charged thereby. *2 R. S.* 135, § 53. W. C. Green as the broker of Davis & Brooks, was authorized by them to make sale of one hundred tons of English bar iron which they were to receive by the brig Anna; but which had not yet arrived. Pursuant to that authority, he contracted to sell, and Shields agreed to buy of them, fifty tons of the iron, at the rate of $70 per ton, payable in six months from the delivery thereof; provided the iron arrived within a reasonable time and was in good order. This agreement was neither subscribed by the broker nor

by Shields; but Green made a memorandum thereof in his book, in the following form:

" Jan. 21st, sold this day to George W. Shields on acc. of Davis & Brooks fifty tons of English bar iron:

Say, ............................. 25 tons 1¾ and ½

25 " ⅝

—

50 tons

at 70 cents, to arrive on board per brig Anna. · Said iron to be in good order or no sale."

It will be seen that this memorandum does not contain the terms of the sale as agreed upon between Shields and the broker, as it does not contain the agreement for the *six months credit*, nor that the purchaser was not to take the iron if it did not arrive in a *reasonable time*. Indeed, if the memorandum is correctly printed in the error book, it did not contain the price of $70 per ton as agreed upon by the parties. I presume, however, that the substitution of seventy cents for $70, was a mere typographical error in the printing of the memorandum. The vessel arrived with the iron between the 15th and 25th of April, after a long passage, having been compelled by stress of weather to put into Lisbon. · At the time of the arrival of the iron the price had risen to $98 per ton. Shields claimed the performance of the contract, and tendered his note, at six months, in payment for the iron; and finally tendered the cash; but Davis & Brooks refused to receive either, or to deliver the iron.

I think the judge before whom the cause was tried was right in charging the jury that, as a matter of law, Davis & Brooks were not excused from performing the contract because they had not iron enough to furnish this fifty tons, and also to fulfil their contract with Pearson. The vessel did in fact arrive with sufficient iron on board to fulfil the contract with Shields, and it was no part of the agreement that Shields was not to have his iron until all other contracts had been fulfilled. It was no excuse, therefore, for

Davis & Brooks that they had deprived themselves of the power to perform this agreement, by selling too much of the cargo to other persons. The vendors, in effect, promised that they had sufficient iron on board the brig Anna, of the kind specified, to fulfil this contract, so that even if the fact of the making of the contract with Pearson had been communicated to Shields, he still would have had the right to demand a fulfilment of the agreement with himself; unless the iron was lost before the arrival of the brig. But I am inclined to think the question whether the iron arrived within a *reasonable time*, was in this case a question of fact, which ought to have been submitted to the jury. If there had been an agreement on the part of Davis & Brooks to deliver the iron within a reasonable time, then the purchaser might have waived that stipulation in his favor and insisted upon the delivery of the iron on its arrival at any time. But in this case, as I understand the agreement, neither party was to be bound by the contract, if, for any cause, the brig did not arrive within a reasonable time. In such a case, if Shields would not be obliged to take the iron at the stipulated price in case it had fallen in value, because the vessel did not arrive within a reasonable time, he could not insist upon having it at that price when it had risen in value while the vessel had been delayed beyond the reasonable time specified in the contract.

The broker's memorandum was also fatally defective in not containing *the real agreement* between the parties, as well as in *not being subscribed* by the agent of Davis & Brooks. Although it is not necessary that both parties should subscribe the agreement, to make it obligatory upon the one who does subscribe the same, it is necessary that they should both assent to such agreement, to make it binding upon either. Here Green was not the broker of the buyer who made his own contract. He was therefore the agent of the vendors merely; and if his name had been subscribed to this memorandum, which was never shown to Shields, it would not have made such a contract, which

he had never assented to, binding upon him; nor even would it have been evidence of the acceptance of such a contract on the part of Shields; and without an acceptance on the part of Shields, it could not be binding upon Davis & Brooks. The omission of the stipulated *time of credit* in the written memorandum, rendered the supposed agreement stated therein, wholly inoperative as to both parties: as to the purchaser, because he had not signed any such contract, or authorized any one to sign it for him, and as to the vendors, because he had never consented to accept of such an agreement from them; and there being no contract which was binding upon either party at the time the parol agreement was made, Shields could not make it a valid agreement as against the other party, by assenting to the written memorandum, after the subject of the contract had risen more than twenty-five per cent in value.

Again—I think there was no memorandum of any contract subscribed by the parties who are now sought to be charged thereby, or by their agent, within the intent and meaning of the Revised Statutes on this subject. The former statute of frauds, required the note or memorandum of the agreement to be *signed* by the party to be charged thereby. And the courts had not only decided that it was not necessary that it should be signed by both parties, so as to make it legally binding upon both, or upon neither; but they had in many cases, held that a literal signing of the memorandum by the party who was sought to be charged thereby, was not necessary. It will be seen however, by a reference to their notes, that the revisers proposed to alter the law, in both these particulars. They therefore proposed a section requiring the agreement to be reduced to writing at the time it was made, and that it should be *subscribed* by the party by whom it was to be performed, and by all the parties thereto, where it contained promises to be performed by each of them. *See* 3 *R. S. 2d ed.* 656. And they state in express terms, that one

of the differences between the section prepared by them and the old law is, in requiring the agreement to be *subscribed;* by which term, as their note to the eighth section of the preceding title shows, it was intended to require a literal signing of the agreement at the end of the same. The legislature, however, differed with the revisers as to some of the proposed alterations, both in relation to contracts for the sale of real estate, and also as to agreements for the sale of chattels and choses in action. They therefore only required the contract for the sale of lands, or any interest therein, to be subscribed by the party by whom the sale or lease was to be made, or by his lawfully authorized agent; and the agreement for the sale of chattels, &c. to be subscribed by the party to be charged therewith. They therefore intentionally retained the word *subscribed* in both sections, as proposed by the revisers, for the purpose of requiring an actual signing of the agreement or memorandum thereof in writing; and to provide for the only case in which they deemed it safe or expedient to dispense with a literal signing, or subscribing of the note or memorandum of the agreement in writing, the legislature introduced a new section, not prepared by the revisers, providing that an auctioneer's memorandum, specifying the terms of sale and the names of the vendor and purchaser, should be valid. 2 *R. S.* 136, § 4. Without entirely disregarding the declared will of the legislature, therefore, I do not see how it is possible we can consider this imperfect broker's memorandum, which does not purport to have been signed or subscribed by any one, to be a memorandum of this agreement, subscribed by Davis & Brooks, or by their agent. *See Herbert* v. *Turner and others*, 6 *London Jurist*, 194. I am therefore compelled to declare it as my opinion that the agreement made verbally by their broker with Shields, was not legally binding upon them; and that the judgment of the court below should be reversed, and a venire *de novo* awarded.

1841.

Davis
*v.*
Shields.

By *Senator* VERPLANCK.  A broker is employed to sell a quantity of iron expected to arrive in a certain ship.  He makes an agreement for the sale at a credit of six months and upon a condition suggested by the purchaser, that the iron should arrive in reasonable time.  The terms thus agreed upon between the broker and the buyer are communicated by the former to the owners, and assented to.  The broker enters in his sale book a memorandum of the agreement, omitting the terms of *reasonable period of arrival*, and the stipulated *six months credit*.  No sale note is given to either party, nor was the entry in the sale book communicated to either.  The iron does not arrive until after a passage of five or six times the ordinary length, during which the price of iron rises in the New-York market.  Upon the arrival of the vessel, the importers refuse to deliver the iron, or comply with the agreement.  The reason assigned for such refusal appears to have been that the iron did not arrive in a reasonable time, as the probable motive was the rise in the market price of the article above the contract price.  But whatever may be the merits of the controversy as between the individuals, the transaction is governed by general rules of public utility and positive legislation; and upon these it must be decided.

Our Revised Statute of *Frauds* enacts that " every contract for the sale of any goods, chattels or things in action, for the price of fifty dollars or more, shall be void, unless a note or memorandum of such contract be made in writing and subscribed by the parties to be charged thereby." *2 R. S.* 136, § 3.  If this contract of sale be void from defect of compliance with these positive requirements of the statute, it will not be necessary to inquire how far the condition of arrival within reasonable time, demanded originally by the buyer, is a stipulation for his benefit only which he may waive by an after ratification of the defective memorandum, or whether it be not also a valid ground of defence to the sellers.

We have here a broker's memorandum of an agreement of sale, distinctly mentioning the names of buyer and seller—" Sold this day on account of Davis and Brooks to G. W. Shields, fifty tons of bar iron," &c. Allowing this entry to be a correct note of the contract, and to have been made by an authorized agent of the parties, or at least of the party to be charged in this suit, is it yet duly *subscribed* within the meaning of our Revised Statutes? Our former statutes, preserving the language of the original English act, prescribed that the required memorandum should be *signed* by the parties to be charged. A series of decisions in England, adopted as the rule of our own courts, had established the construction that a mention of the names of the principals in a note of the agreement of sale, made by an authorized agent of the party sought to be charged, was a valid signing within the act. The earlier cases giving a judicial interpretation to the legislative word *signed*, both in the statute of frauds and as used in respect to wills, were governed by the probable intent of the parties: as when a testator wrote his name in the beginning of a will, " I, A. B., do make this my last will;" or when a party contracting to sell, wrote or printed his name in the actual offer or contract, as " I, C. D., do agree or offer." This natural extension of the word *sign*, was gradually enlarged to include every and any mention of the party's name, by himself, or by his authority express or implied, made in any note of the agreement. In this way, prior to the revision of our statutes, it had become a settled point, and was so stated in all the books and cases on this subject, that if the name of the party to be charged appeared in the memorandum so as to be applicable to the whole substance of the writing, and written by himself, or by his authority, or with his presumed assent, it is immaterial where the name appear, whether at top or bottom, whether as the signature to a bargain or merely mentioned in the note as that of a buyer or seller. *Sanderson* v. *Jackson*, 2 *Bos. & Pul. R.* 238. *Wilford* v.

*Bearsley*, 3 *Atk. R.* 580. *Merritt* v. *Clason*, 12 *J. R.* 102; affirmed in this court, 14 *Johns. R.* 487. In this last case, Chancellor Kent, after stating the law as above, adds: " Forms are not regarded, and the statute is satisfied if the terms of the contract are in writing, and the names of the contracting parties appear." The object of the original act was, as its title avows, " the prevention of frauds and perjuries," by substituting for the loose recollections of memory and the mutual danger of misconception of parties, a precise written agreement, or at least, a distinct written memorandum of the contract. Yet it so happened, that both as well in respect to this matter of signing, as to several other points, such as the note being made at the time or afterwards ratified, the requiring the names of all the parties or only that of the party charged in the suit, the literal interpretation of the statute, and probably its real original intention came into perpetual collision with the actual habits and usages of life, so that during two centuries of doubtful litigation the courts have been led to strive to give the statutory words the largest and most convenient construction they could possibly bear. Thus, at the expense of millions during two hundred years of litigation, an artificial and technical meaning had been framed in England, which was received and embodied in our own law. Probably the necessity of the case, the real inconvenience of a more natural interpretation, combined with the difficulty of legal reform in those days, may have been a sufficient cause, or at least a fair excuse, for latitudinarian exposition in the courts. These seem to be the true reasons why the meaning of a short statute, drawn by Chief Justice Hale, a man eminent alike for legal accuracy and various scholarship, has required volumes of judicial commentary. In our form of government and state of society, the simpler and wiser mode of reconciling the conflict of positive law with the habits and conveniences of trade and life, is to receive the words of every statute in the usual and customary acceptation, unless they have al-

ready acquired some other fixed technical meaning, and to resort to corrective legislation as the true remedy for any evil or inconvenience thus resulting from a fair interpretation of the law. I am always desirous to apply the same principle to the construction of our Revised Statutes. Mere changes of phrase, or remoulding of sentences, must be far from authorizing us to set aside any less obvious meaning which has been fixed and settled by long and constant adjudication. In such instances, phrases and sentences re-enacted with slight alteration, are manifestly employed in their strict legal sense, as much so as single technical words; for there may be a technical meaning in a sentence or phrase differing from the usual and popular one, as well as in single words. When such interpretations, however artificial at first, have been wrought by long usage into the body of the law, and the habits of those who are to be governed by it, the harsh return to a more popular signification would be in clear contradiction to the legislative will, and by unsettling the law would open the door to the admission of the very uncertainty and litigation it would seek to exclude. Nevertheless, it is equally evident that it was the design of our revision to improve the substance of our enactments, as well as to give greater simplicity and perspicuity to their language. In such alterations, where no arbitrary or technical signification has been incorporated into the language of the law, we should look to the usual sense without resorting to the analogy of old decisions to engraft again a similar artificial sense upon new words. The doctrine which Lord Ellenborough has strongly and wisely stated as his own governing rule of statutory interpretation, and which he did not hesitate to apply to the English statute of frauds itself, after so many years of forced constructions, applies with still greater reason to our own revised code: " In all cases where the words of a statute have not by long habitual construction received a peculiar meaning, *such as they will allow of*, I

**1841.**

Davis
*v.*
Shields.

am always inclined to give them their natural ordinary sig-nification." *Wain* v. *Warlters,* 5 *East. R.* 10.

How, then, stands the case as to the change of language in the section now under consideration ? Does, or does not the change of phraseology evidently purport the intent to change the law ? What is the signification of the words used in the revised act, and how do they differ from the language of the former acts ? Our former acts, like the English statute of frauds, required " some note or memo-randum in writing to be made and signed by the parties, or their agents lawfully authorized." 1 *R. L.* 79. The verb " *to sign,*" in its primary, derivative and ancient sense, signifies " to shew or declare assent, or attestation, by some sign or mark." Thence it early passed to mean the show-ing or declaring such assent or attestation by the customa-ry mark of the written name. In ordinary, as well as in legal use, it is now understood to mean, " to write the name in any such way as will indicate that the writing with which it is connected expresses the assertion, the pro-mise, or the act of the signer, according to the nature of the writing." It may be at the end or elsewhere, as in the margin in the official acts of some public officers, and sometimes in the attestation of witnesses. Thus, one of those ancient decisions on the meaning of the word in the statute of wills, which led on to much bolder interpreta-tions, says very justly, in the quaint language of those days, that the writing of the name on the same paper would an-swer " *serviroit per tout* et n' est material si soit signe en le top ou bottom, car le statut ne dit *subscribed* me sign-ed." *Hilton* v. *King,* 3 *Lev. R.* 86. But, as already sta-ted, a far greater latitude has been since given, judicially, to this word, until any mention of the name was held to be a signature, as in cases like that of *Knight* v. *Colford,* 1 *Esp. Cases* 190, where, said Lord Eldon, commenting upon it, " it is impossible not to see that the insertion of the name at the beginning of the paper was not intended to be a signature, and that the paper was meant to be incomplete

until it was further signed." *Saunderson* v. *Jackson*, 3 **1841.**
*Bos. & Pul. R.* 239. Thus, the word signing in the statute
book, came to bear an authoritative meaning, in certain Davis
connections, beyond its usual legal sense, and to include Shields.
any mention of the name, if made by the party himself or
with his assent express or implied, and in connection with
the terms of the agreement. Now, it would seem that the
deliberate omission of a word, that had thus acquired a re-
markable and peculiar extension by express adjudication,
and the substitution of another word, even one synonymous
in common use, but which had never gained a secondary
technical sense, would strongly indicate the legislative in-
tent to modify the substance of the statute. But the sub-
stituted word is " subscribed." This, literally and accord-
ing to its derivation, means " to write beneath," but in ha-
bitual use it denotes the writing the name at the end of any
writing, in token of assent or attestation, according to the
import of the writing itself. It has a secondary meaning,
but that is purely metaphorical, denoting the consent, as-
sent, or promise thus conveyed, without reference to the
external mode of expressing it, as " I subscribe to Ricar-
do's doctrine of rent." This, Judge Cowen intimates, may
be the sense in which our statute employs the word. But
this secondary sense is excluded, when actual writing is
spoken of; and besides, holds only when the word is used
as a neuter or intransitive verb, accompanied by the pre-
position *to*. This distinction may be observed, alike in col-
loquial use and in correct written style. Thus, " I sub-
scribe to the New-York Review," means a promise to re-
ceive and pay for the review; but used transitively, the
meaning is of literal subscription, as " I subscribed the
proposals for the New-York Review." So, the clergyman
of the Anglican church subscribes the XXXIX articles.
This has the literal meaning of manual subscription, deno-
ting at the same time mental assent. But if it be meant
merely to say that the theologian assents to these doctrines,
it would be said that " he subscribed to the articles." So

also, in the grave and noble style of Hooker, in the passage cited by Johnson to illustrate this use, " The Nicene creed was framed for the world to subscribe *unto*. But another great master of English idiom, when speaking of a literal and manual subscription, says: " They united by subscribing a covenant, which they pretended to be no other than had been subscribed in the reign of King James, and that his majesty had himself subscribed it." *Clarendon's History*. Thus, then, alike in colloquial use and in that of good writers, the words " note of the agreement in writing, subscribed by the parties," would mean a note of the agreement with the names of the parties signed below or at the end, so as to denote assent thereto. Thus, taking the usual sense of the words, in their literary or their colloquial use, the legislature must appear to have intentionally substituted a word of known and limited meaning, to the word *sign*, having a wider primitive sense, as well as a very broad technical signification unknown to familiar usage.

Let us next look at the legal authority indicating the technical meaning of these two words. Have the decided cases giving a legal and professional sense to the word " sign," comprehended either directly or indirectly the analogous but not synonymous word, " *subscribe ?*" A brief examination of the legal use of these two words will convince us that this is not the case. In the earliest adjudications of the statutory sense of the word *sign*, it was expressly distinguished between these two words, and the decision of the court supporting a mention of the name in the beginning of the instrument as a good *signing*, was founded on the reason, that " the statute does not say *subscribed*, but *sign*." *Hilton* v. *King*, 3 *Lev. R.* 86. *Le Mayne* v. *Stanly*, 3 *Lev.* 1. I cite these ancient decisions because they have been kept alive by constant reference as the foundation of modern decisions. The same distinction between the two words in question has been made by later English judges, among them by Lord Chan-

cellor Hardwicke, if I recollect rightly. It is also to be found in the most approved text books on this head of the law, as in *Roberts on Frauds*, 119. The same distinction is quite familiar in the reports of our own courts. In *Merritt* v. *Clason*, 12 *J. R.* 102, this point was immediately under consideration, and the eminent counsel by whom the case was argued, insist on the one side on the plain distinction between *signing* and *subscribing*, and admit it on the other. " *Signing* does not *ex vi termini* mean that the name of the party should be *subscribed*," said the late John Wells, a speaker and writer remarkable for his precision in the use of language. On the other side, D. B. Ogden, thus replies: " I do not say that the agreement must be *subscribed*, but that it must be *signed* in some part of the contract." The point decided, is thus stated by the learned and accurate reporter of that day, Mr. Johnson, in the marginal note of the case: " A memorandum of a contract for the purchase of goods written by a broker in his book in the presence of the vendor, and the terms of the purchase being in the body of the memorandum, but not *subscribed* by the parties, is a sufficient memorandum within the statute." 14 *J. R.* 485. The language of eminent counsel and a distinguished reporter is cited, not as legal authority, but as indisputable evidence of the usage of words, professionally and technically, a very few years before our revision of the statutes. Thus, we have ample evidence of the legal distinction as familiar to the use of judges and lawyers as to the general understanding between the operative word of the old statutes and that selected in its place in the late revision.

Finally, our learned revisers, in their reports to the legislature upon this and the analogous point of contracts for the sale of lands, &c. observe that " it had been held that under the former statute, the literal act of *signing* was not necessary. After setting out with that principle, the courts found themselves perfectly at large as to what should be considered as signing. To prevent difficulties, the revisers

recommend that those agreements should be *subscribed.*" With such a constant and familiar distinction as to the meaning of the words in question, the revisers recommended a re-enactment of the statute of frauds as to agreements for the sale of chattels, &c. with some modifications, such as that " the agreement should be reduced to writing at the time it was made, and be subscribed by the party by whom it is to be performed, and by all the parties when such agreement contains provisions to be performed by each of them." These proposed innovations were all in opposition to the judicial constructions of the old law. The legislature adopted the alteration of *subscribing* for *signing*, and rejected the rest. Thus, to my mind, the chain of evidence is complete as to the meaning of these words, and the obvious intent of the substitution of one word for the other. If this conclusion needs the support of farther argument from the history and policy of the law that may be found in abundance.

The avowed design of all the legislative enactments on this head from the original statute of 29 Charles II. down to our own day, was " the prevention of frauds and perjuries," by refusing the aid of the law to enforce any contract not supported by written evidence, or which needed parol evidence to support it. Years of litigious warfare, thousands of suits and page after page of the reports had proved that a mere agent's memorandum was not sufficient to exclude differences of understanding between the parties, contradictory testimony at the trial, and grave doubts on the bench. Questions would still arise as to the agent's authority to make the bargain and his accuracy in noting it down. Was it not, then, to be expected that the legislature, in a formal and deliberate revision, aided by professional and official advisers, should endeavor to remedy some of the defects that had frustrated the good designs of former legislators ? One mode, at least, of attaining this end would be the requiring an actual subscription to the agreement, or to the statement of its sub-

stance either by the parties themselves, or their legal re-
presentatives, so as to prove this to be a ratified bargain,
and not a note of some imperfect negotiation.

When subscribed by the parties themselves, that memo-
randum would become the contract itself, and so put an end
to all questions about prior negotiations.   When signed by
an agent, there would be formality enough to direct his
attention to the matter, and induce him to be sure that he
had authority to sign in the name of his principal the
agreement on which the contracting parties met.   Addi-
tional words or conditions varying the bargain would be
excluded from any after insertion, by what the plaintiffs'
counsel has happily termed " the closing completeness of
the act of subscription."

Adding, then, these manifest considerations of public
utility to the cumulative evidence of the history of the law
and the meaning of the words successively employed,
either in their popular, their literary or their legal signifi-
cation, I cannot doubt at all, that the subscription required
by the statute is no longer satisfied by the bare mention of
the name in the body of the memorandum, but must be
such a subscription as clearly denotes a deliberate assent to
the settled terms of a contract.   The agreement for the
sale of the iron between the parties is, therefore, void for
want of the evidence expressly demanded by the policy of
the law.

This conclusion may appear to many of my colleagues,
as I confess that it does to myself, too obvious to re-
quire the details of argument and authority that I have
presented.   But it is a conclusion in opposition to that of
learned and able judges, and the impor:ance of the rule to
be now settled, operating daily and hourly upon immense
transactions, will excuse and even justify the details into
which I have entered.

II. In a court composed of few members, where the
opinions of all may be brought to bear upon a single point,
I should have preferred to rest the decision of this cause

**1841.**

**Davis**
**_v._**
**Shields.**

here, without caring to examine any other point which has been raised. But should there be much difference of opinion on the point just considered, it may be of importance to the decision of the cause, to notice another aspect of the case, in my judgment equally conclusive against the affirmance of the judgment. It besides presents a question which may often arise under any understanding of the statute as to the required subscription upon contracts of sale, signed in the most formal manner by agents or persons assuming to act as such.

Allowing then the broker's memorandum in his book to contain a valid subscription in its form, do the facts shew a mutual and binding contract entered into and signed by authority of the parties proposed to be charged as vendors? A doubt naturally arises whether, under our Revised Statute, the words " to be subscribed by the parties to be charged," do not require that the agreement should be from the first binding by means of an authorized signing upon _all_ the parties to the bargain. If this could be considered as an entirely open question, I should adhere to the opinion of Lord Chancellor Redesdale, that " a contract to be binding, ought to be mutual in its obligation;" _Lawrence_ v. _Butler_, 1 _Schoales & Le Froy R._ 13; so that if one party could not enforce the agreement, the other could not. But our revision has here retained the very words repeatedly adjudicated upon, and the legal sense of which had been expressly settled a few years ago in this court. _Clason_ v. _Merritt_, 14 _Johns. R._ 485. This was in conformity with numerous prior decisions as is shown in the opinion of Chancellor Kent in that case. An alteration of the statutory language had been recommended by the revisers, so as to make it conform with the opinion of Lord Redesdale, and to exclude the old construction, which they said, " Many of the ablest judges in England and this country had regretted." _Revisers' notes_, 3 _R. S._ 656. The legislature rejected that alteration, and adhered to the old words. Here, then, it seems to me, these words

must be taken in their fixed and adjudicated sense, according to which it is enough that the agreement be signed or be aurized to be signed by the party to be charged in the suit. Nor is this interpretation withoutthe support of reasons of equity, independently of authority. It is within the literal sense of the words used. The original contract is morally binding on both sides, and the promises to buy and sell are mutual considerations for each other. The statute then requires written evidence of the bargain. One party gives this, and it is his own neglect that alone prevents him from obtaining the same evidence from the other. But he ought not to take advantage of his own negligence, nor should that free him from the legal effect of his own promise, duly evidenced in writing, according to law. When therefore the other party makes his legal claim, his declaration and claim furnishes the required note or memorandum, and the statutory requisition is complete. I adhere then to the old adjudicated meaning of the words retained from the original statute, and consider it sufficient if the memorandum was authorized by the vendors who are now to be charged, although it might not have been originally binding upon the vendee.

But another question then arises : does the evidence show that the contract sought to be enforced was duly made by an authorized agent, and reduced to writing by him ? A bargain for the sale and purchase of the iron is made through a broker, upon certain terms offered by the vendors, with the addition of two other conditions, demanded by the vendee and agreed to. One of these conditions " provided that the iron should arrive in reasonable time," might according to circumstances, prove beneficial to either party. The risk of being obliged to take the iron at any time, however distant, was one that the buyer did not wish to take, and this condition was primarily for his protection, but it might also be thought advantageous by the sellers who accepted it; and so it was in fact rendered by subsequent contingencies. The sale was

also on a six month's credit, which was evidently for the buyer's convenience. The agreement on such terms was known to both parties and had their assent. For the purposes of the bargain so far, the broker was the mutual agent of both. But he was not therefore the agent of both or of either to make the note or memorandum, unless so far as he had their assent. No parties are bound by a broker who exceeds his authority. Here he makes an entry of the agreement, omitting the terms of credit and of arrival in some reasonable time. Had this been signed by the vendors, it would, as to them, have formed the contract itself, in which all prior negotiations would have been merged. But neither party in person signs the agreement, and though the vendors consent to the real contract, there was not a jot of evidence that they ever saw or knew of the agreement as entered in the sale book. For the purpose of entering such a different contract, the broker does not appear to be an authorized agent, either from his general powers or from any after assent. He was an agent to make a bargain and communicate the terms; as such, he was empowered to make a memorandum of the bargain thus made; but he was not authorized to alter that agreement or to make an entry of another and different contract. Supposing in this case, that instead of omitting two conditions, one important to the buyer, the other as the event proved, beneficial to the seller, he had made a note of a sale of 500 tons instead of 50; would his authority to sell and preserve the evidence of an agreement for the sale of fifty tons enable him to bind his principal to the larger contract? Or would any subsequent ratification by the vendee alone, make such a contract binding upon the other party? The agreement to sell on certain terms, was valid in itself; but it must be reduced to writing, or it is void by the statute. No note of that bargain as actually agreed upon is made, but there is an entry of a contract varying in its terms from that, and not shown to the parties or assented to by them. If it be now ratified

by the buyer, it is binding upon him, if the sellers judge proper to enforce it; but how is it binding upon the sellers who have never so assented and who now reject the terms ? This case then falls within the principle laid down by Chief Justice Abbott, in *Grant* v. *Fletcher*, 5 *Bos. & Pul.* 436: " A broker may bind both parties by signing the same contract on behalf of both parties. But if he does not sign the same contract for both, neither will be bound." It has therefore often been decided, that when a broker delivers a different note of the contract to each party, there is no mutual contract. Here the note differs from the real contract, and if it be afterwards ratified or adopted by one party, then there is a different contract as to the two. The case resembles that of *Hurd* v. *Whitehouse*, 7 *East.* 568, where Lord Ellenborough said, " In treating this as the memorandum of the actual sale, we must intend *contrary to the fact*, that the goods were sold for ready money, and the sale unattended by the circumstances mentioned in the conditions of sale." In short, the agreement of sale, when made and reduced to writing, cannot be explained away or contradicted by parol proof. But if the writing or signing be by an agent or broker, then parol or other evidence is not only admissible but necessary to show that he is authorized to sign just such a contract. The evidence here negatives that authority, and whatever may have been the intention of the parties, or however much or little the stipulation of the arrival of the iron within a reasonable time seemed essential to the bargain in the minds of the vendors, there is still no actual agreement for the sale of goods concluded by the parties, of which a note or memorandum in writing has been made.

I must add a single remark as to the policy of the law. I do not see how we can sustain this entry as a binding note of the sale, upon any presumed equity of this particular case, without giving a very dangerous extension to the implied authority of brokers or other agents for sales. To constitute the simple fact of being authorized to make

1841.

Davis
v.
Shields.

1841.

Davis
*v.*
Shields.

a bargain, as the conclusive or even the presumptive evidence of being also authorized to sign any memorandum of the bargain, however variant from the real one, and then to substitute that memorandum for the contract itself, at the pleasure of either party, would place all principals at the mercy of the fraud, the mistake, or the carelessness of brokers or agents, whether selected by themselves or by the persons with whom they may happen to contract.

The judgments of the courts below should be reversed on both or either of the grounds above stated.

*Senator* PAIGE expressed the opinion that by the substitution of the word *subscribed* for the word *signed*, used in the old statute of frauds, the legislature did not intend to change the law. This he thought was manifest from the consideration that in the *Statute of Wills*, the two words were used as synonymous: the fortieth section requires the will to be *subscribed* by the testator, and the next section speaks of the testator's name being *signed* by a third person under his direction. 2 *R. S.* 7, § 40, 41. The word *signed* as used in the statute of frauds, he said, had received a fixed judicial construction, which he thought should be applied to the word *subscribed*. He therefore considered the memorandum of the broker sufficient, and should vote for an affirmance of the judgment.

On the question being put, *Shall this judgment be reversed?* all the members of the court present at the hearing of the argument, except *Senator* PAIGE, voted in the affirmative: he voted in the negative.

Whereupon the judgment of the
supreme court was REVERSED.