RENSSELAER GENERAL TERM, November, 1849.    *Wright,*
*Harris, and Watson,* Justices.

JAMES *vs.* M. and S. PATTEN.    *Am. 1. 130.*

A bill of sale in this form, " Albany March 12, 1847, Mr. Thomas James, bought
of M. & S. Patten (for the relief committee) 3000 bushels of yellow corn, (fifty-
six pounds per bushel) to be delivered at the opening of the Hudson river
navigation, at our store in Albany, at eighty-one cents per bushel, $2430," in
the hand-writing of one of the vendors, is a sufficient note or memorandum,
within the statute of frauds, although the names of the vendors are not sub-
scribed at the bottom thereof.

The legislature, by the substitution of the word "*subscribed*" for the word "*signed,*"
in the section of the statute of frauds requiring a note or memorandum to be
made of contracts where the value of the goods is $50 or more, did not intend
to effect any change in the previously existing law, in respect to the method of
signing the note or memorandum.

The case of *Davis* v. *Shields,* (26 *Wend.* 341,) commented on and explained.

THIS was an action of assumpsit. The declaration was on
a special contract, as follows: "Albany March 12, 1847. Mr.
Thomas James bought of M. & S. Patten (for the relief com-
mittee) 3000 bushels of yellow corn, (fifty-six pounds per bushel,)
to be delivered at the opening of the Hudson river navigation,
at our store in Albany, at eighty-one cents per bushel, $2430."
The bill of sale was admitted to be in the hand-writing of Sam-
uel Patten, one of the defendants; and it was shown in proof
that after a negotiation and agreement for the purchase of the
corn the bill of sale was delivered to the plaintiff. After the
opening of the Hudson river navigation a tender of the money
was made by the plaintiff, and a delivery of the corn demanded.
The defendants refused to deliver the corn or take the money.
The plaintiff rested, after showing that the market price of corn
at Albany, at the opening of navigation, was ninety-seven cents per
bushel. On motion of the defendants' counsel his honor Judge
Parker nonsuited the plaintiff, on the ground that the bill of
sale was not a sufficient compliance with the statute of frauds,
as the names of the defendants were not signed at the bottom

of said bill of sale.   To which decision the plaintiff's counsel excepted.

*S. H. Hammond,* for the plaintiff.

*C. M. Jenkins,* for the defendants.

*By the Court,* WRIGHT, P. J.   The sole question in this case is, whether the legislature, by the substitution of the word *"subscribed"* for the word *"signed,"* in that section of the statute of frauds requiring a note or memorandum to be made of contracts where the value of the goods is fifty dollars or more, intended to effect a sudden and radical change of the law as it had been clearly settled by numerous adjudications of the courts prior to the revised statutes; compelling the courts, as Mr. Justice Cowen has expressed it, "to suddenly wheel about, and turn their faces against the former principles of construction."

The British statute, and our own prior to the revision of 1830, required the note or memorandum to be made and *signed* by the parties to be charged.   Under these statutes it had been often held by our own and the English courts, that an actual signing at the bottom of the contract was not absolutely required; that the statute was satisfied, and it was immaterial in what part of the instrument the name of the party to be charged thereby, appeared; whether at the top, in the middle, or at the bottom, provided it was put there by himself or by his authority; that the courts were to see that the substance of the statute had been complied with in the material part, rather than to insist strenuously upon the form; and that a subscription by inserting the name in some part of the instrument was as effectual a guard against fraud and perjury (the mischief which the statute intended to avoid) as though such name were placed at the bottom of the instrument.   (*Long on Sales,* 57, *et seq. Rand's ed. of* 1839, *and cases cited.   Merritt* v. *Clason,* 12 *John.* 102.   14 *Id.* 484, *S. C. in error.*)   Thus the statute had been construed, and thus the law stood, at least up to the revision, and commercial men governed themselves accordingly.

These principles of construction were fully understood, and contracts of sale to be tested by the statute of frauds, were made and predicated upon them.

In the revision of 1830 thè word "*subscribed*" was substituted for the word "*signed.*" By this verbal deviation from the former statute it is insisted that the legislature intended that there should be a signing or subscription at the bottom of the instrument, and nowhere else. This view of legislative intention is based solely on the fact that the revisers, in their notes, avowed such intention by the substitution of the word "*subscribed,*" and that the legislature, though changing substantially the sections of the statute as reported by the revisers, retained the substituted word. This ground being confidently assumed, it may be important to briefly trace the history of legislation relating to the substitution of the word "*subscribed.*" To my mind it is manifest that whatever may have been the intention of the revisers, the legislature retained the word *subscribed* as reported to them in the section of the statute I am now considering, without a definite intent to overthrow the principles of construction that had been applied by the courts for more than half a century. In the revisers' report of section 8 of title 1, concerning "fraudulent conveyances and contracts relative to lands," they proposed to change the law as it then stood, by omitting the words "note or memorandum thereof," and requiring the contract for the leasing for a longer period than one year, or for the sale of any lands, to be reduced to writing, and subscribed by the parties *by whom and to whom the lease or sale was to be made.* The legislature struck out of the section the amendments proposed by the revisers, and re-enacted it substantially as it had stood, retaining, however, the word *subscribed,* as it had been reported. In the revisers' report of the section now under consideration, they also suggested material alterations of the law. The section as reported provided that the note or memorandum of the contract should contain the names of the parties, a description of the thing sold, and the price thereof, and should be reduced to writing at the time the contract was made, and subscribed by all the parties thereto.

The legislature rejected the report of the revisers, and re-enacted the old statute substantially, retaining the substituted word *subscribed*. In both these cases, the declared intention of the revisers to change the law, and overthrow the decisions of the courts in important particulars, was repudiated by the legislature; and though the word *subscribed* was retained as reported, it may well have been for the reason that in the view of the law-makers the words *signed* and *subscribed* were, as they always were in common understanding, of equivalent meaning. We say of an individual that he *signs* or that he *subscribes* a contract—that he has *signed* or *subscribed* an instrument; meaning thereby the same thing. That the legislature thus regarded the words is quite apparent from the synonymous use of them in the revised statutes concerning wills. In the former statute of wills it was provided "that the testament should be in writing, and *signed* by the party making the same." It had been held that the statute was satisfied, if the testator wrote his name at the beginning of the will, as, "I, A. B. do make my last will," &c. In this respect the legislature clearly intended to change the law, and designed by usual, proper, and apt words to effect such intention. Amongst other provisions in relation to the manner in which a will should be executed and attested, it was enacted that it should be *subscribed by the testator at the end thereof;* thus making clear their intention that a will should not be valid if the name of the testator was signed or subscribed otherwise than at the end of the instrument. But in the same statute they used the words *signed* and *subscribed* as importing literally the same meaning. The testator is to *subscribe* his name to the will, at the end thereof; the witnesses are to *sign* their names at the end thereof; and "every person who shall *sign* the testator's name to any will, by his direction, shall write his own name as a witness to the will." In these instances the words are used synonymously, in their literal sense; but the legislature, intending that the signature of the testator should be at the bottom of the instrument, carefully used words to definitely express that intent. If, in the view of the legislature the word *subscribe* only imported the writing of one's name at the

James *v.* Patten.

bottom of the instrument, and they so used it in the statute of frauds, the words "at the end of the will," in the statute concerning wills, enacted simultaneously with the statute of frauds, were unmeaning and useless verbiage. But in my judgment the legislature regarded them as essential to give full expression to their intent. The words *subscribe* and *sign* are indiscriminately used in the same statute; but that there should be no room left for construction, such *subscribing* or *signing* must be "at the end of the will." It appears to me that had a similar intention existed in relation to the note or memorandum required by the statute of frauds, it would have been manifested in the same way. When, therefore, the legislature, in the same revision, in sections prepared by the lawmakers themselves, use the words synonymously, but intending to declare definitely that the subscription shall be at the end of the instrument, designedly add other words to express such intention, the argument is not a very strong one which maintains a like legislative intention from the mere substitution of one word for another. It has been forcibly urged by an able jurist, that it is an evil "to consider every literal or verbal deviation in our revised statutes from the former acts which they adopt, as a change in substance;" and that "to make the numerous verbal alterations in our revised statutes, in all or in a majority of instances, an actual departure from the former law, would be to open Pandora's box." (*Davis* v. *Shields*, 26 *Wend.* 329.) The true rule with respect to a revision or enactment of any branch of the law is thus stated by Chief Justice Kent and Mr. Justice Spencer in *Taylor* v. *Delancey*, (2 *Caines' Cases in error*, 150,) and *Yates' case*, (4 *John.* 359.) "When a law, antecedently to a revision of the statutes, is settled, either by clear expressions in the statutes, or adjudications on them, the mere change of phraseology shall not be deemed or construed a change of the law, unless such phraseology evidently imports an intention in the legislature to work a change. * * * A contrary construction might be productive of the most dangerous consequences. The quaintness of expression in some of the ancient British statutes, and the circumstance of there being several statutes on the same

James *v.* Patten.

subject, required in many cases an entire change of language, but it has never been contended that thereby an alteration of the law was to be inferred."

But it is urged that the point in this case has been definitely adjudged by the court for the correction of errors, in *Davis* v. *Shields*, (26 *Wend.* 341.) If this be so, we have no course to pursue but to follow that decision. From an examination, however, of that case, as reported, it is impossible to arrive at a satisfactory conclusion as to the point on which a majority of the court voted for a reversal of the judgment of the supreme court. This difficulty arises, in a great degree, from the peculiar organization of the court of errors, and the practice which prevailed therein in the latter periods of its existence. In the case of *Davis* v. *Shields* Chancellor Walworth and Senator Verplanck delivered opinions for reversal, in which they made two distinct points; 1st. That as the contract entered by the broker in his sale book varied from the contract as actually concluded, neither party was bound, inasmuch as no note or memorandum of the actual contract had been reduced to writing; 2d. That to be valid, within the provisions of the revised statutes, the note or memorandum of a contract for the sale of chattels, must be signed by the party to be charged thereby, below or at the end of the memorandum. The chancellor discusses the question involved in the first point, and arrives at the conclusion that the judgment should be reversed on that point, as distinct from the second. He then proceeds to discuss the second, and regards that also as well taken. Senator Verplanck commences with a discussion of the second point, and comes to the conclusion that the statute requires an actual signing at the bottom of the memorandum, but apprehensive, as he states himself, that the opinions of all the members of the court might not be brought to bear upon this single point, and there might be such a diversity of opinion that it would not be safe to rest the cause thereon, he deems it of importance to the decision to notice the first point, which is, in his "judgment equally conclusive against the affirmance of the judgment." Proceeding then to discuss the first point, he arrives at a conclusion equally

satisfactory to himself, that the supreme court were in error, and concludes as follows: "The judgments of the courts below should be reversed on *both* or *either* of the grounds above stated." All the other members of the court, (with the exception of Senator Paige, who voted for affirmance,) voted *silently* for a reversal of the judgment of the supreme court.

Now, from this history of the case, can we say that the point we are now considering was directly involved, and deliberately settled? Is it possible to determine whether a majority of the court voted for reversal on the first, or second, or both points? A majority of the court deeming the first point conclusive against the judgment, it was quite immaterial to decide the second. Indeed, assuming with the chancellor and Senator Verplanck, that there was no note or memorandum of the actual contract concluded between the parties, the second point was not involved in the case; for the court was not called on to pass upon the due execution of an instrument which, if signed in the right or wrong place, was wholly nugatory and invalid, and did not affect the rights of the parties. If the memorandum varied from the actual contract sought to be enforced, it were quite a work of supererogation to inquire and determine whether such defective memorandum was properly *subscribed*. I am unwilling to conclude, therefore, in a case where there is so much difficulty to satisfactorily ascertain the precise point decided, that the court of errors have given a construction to a statute, barely from the alteration of a word therein, that overthrows the law as it had previously existed, and is at war with all former rules of construction. In doing this as respects a statute so largely entering into and governing the general business of the community, it is not too much to require that the point should have been presented unconnected with one in itself, as we are told by the members of the court expressing opinions, conclusive in the decision of the case.

In the present case, the note or memorandum was in the hand-writing of one of the defendants. The names of the defendants appeared in the body, and not at the bottom thereof. After the plaintiff rested, the defendants' counsel moved for a

nonsuit.   The judge nonsuited the plaintiff, on the ground that the bill of sale was not a sufficient compliance with the statute of frauds, as the names of the defendants were not signed at the bottom of such bill of sale.

I am of opinion, (in which my brethren concur,) that there should be a new trial ; costs to abide the event.

———————◇———————

Albany General Term, May, 1850.    *Watson, Parker, and Wright,* Justices.