order reversed, and the application dismissed with the $7,50 costs allowed by the vice chancellor, and to pay the respondents' costs upon this appeal, an order to that effect may be entered; provided they give written notice of such election, to the solicitor of the respondents, within twenty days after this decision is pronounced.

------

## COLES and others, executors, &c. vs. BOWNE.

Where a block of land which had been subdivided into several distinct lots was put up and sold at auction, and was struck off to the purchaser at a specific sum, and the vendor upon a bill filed for a specific performance, insisted and proved that the premises were put up and sold by the lot, and the purchaser, in his answer, insisted that the premises were put up as one entire parcel, and that he bid for the premises a price which was for the entire block; and the evidence was such as to render it doubtful whether the defendant understood that the premises were put up and sold by the lot, the court decided that the complainant was not entitled to a specific performance of the contract; without reference to the provisions of the statute of frauds.

Where the complainant in his bill, states an agreement, which, by the statute of frauds, would be invalid unless it was in writing, and subscribed by the vendor or his agent duly authorized, the legal presumption, from the statement of the agreement in the bill, is that it was in writing, unless the fact that it was a mere parol agreement appears from the bill itself. And if the defendant, by his answer, denies the making of the agreement, the complainant must produce legal evidence of such agreement; which can only be done by proving a written agreement duly executed according to the provisions of the statute.

A party who files a bill to correct a mistake in a written agreement, in a case where the court has the power to make a correction therein, must not only state in his bill the agreement as it ought to have been reduced to writing but also the substance of the written agreement itself. And the party alleging a mistake in the written agreement holds the affirmative, and must satisfy the court, beyond all reasonable doubt, that such an agreement as he claims to have been made was in fact made between the parties, and that a mistake has occurred in reducing such agreement to writing.

Under the provisions of the revised statutes an auctioneer's memorandum, of the terms and conditions of the sale of lands by him, entered in his books, specifying the property sold, the price and terms of sale, and the names of the vendor and of the purchaser, is not sufficient to make a valid and binding contract of sale; although such a memorandum is sufficient as to a sale of goods.

To make a valid contract for the sale of lands, the agreement must be in

writing, and must be subscribed by the vendor or his agent; and the name of such vendor or of his agent must be subscribed below or at the end of the agreenent.

Whether a party can come into a court of chancery for the specific performance of an executory agreement for the sale of lands, which agreement is materially variant from the written contract between the parties, and where there has been no part performance of the agreement, nor any other equitable circumstances sufficient to take it out of the statute of frauds, as a mere parol contract between the parties; *Quære?*

THIS was an appeal by the defendant from a decree of January 16. the late assistant vice chancellor of the first circuit. The complainants, as the executors of J. Coles deceased, with power to sell his real estate, filed their bill in this cause for the specific performance of an alleged agreement, by the defendant, to purchase one hundred and one lots and $\frac{36}{100}$ of a lot, in the city of Brooklyn, at the rate of $30 for each lot, estimating each lot to contain 2500 square feet of land. The bill alleged, in substance, that on the 2d of June, 1836, the complainants caused a part of the estate to be sold, at auction, which had been laid out upon a map as city lots in Brooklyn; that the lots, as laid out, consisted in part of gore lots, and that the terms upon which the property was put up from time to time were, that where the parcel contained any gores it was to be estimated according to the number of full lots the parcel contained, estimating each full lot as containing 25 feet by 100, or as containing 2500 square feet; that ten per cent of the purchase money was to be paid on the day of sale, twenty per cent on the delivery of the deeds; and the residue of the purchase money was to remain on bond and mortgage for three years if required, at six per cent interest, payable semi-annually. The bill further stated that among other parcels put up and sold, the premises in question, called in the pleadings and proofs block 13, containing many gores, and numbered on the map of sale from 1 to 133 inclusive, were put up and sold on those terms, at such price for each full lot of 2500 square feet as the purchaser might bid; and that the defendant became the purchaser of the block at the price of $30 for each

full lot, as before stated ; that he paid the auctioneer $3, a portion of the ten per cent to be paid on the day of sale, which was afterwards paid by the auctioneer to the complainants in completion of certain other purchases made by the defendant at the same sale ; that the defendant afterwards admitted that there had been a mistake in the payment of the ten per cent on this block, and that he had paid it only for one lot, when he should have paid it on the map numbers of the lots, being 133 lots, but that it made no difference, as he meant to complete his purchase as soon as the quantity was satisfactorily ascertained, for the whole 133 lots ; and that he had made several offers of compromise subsequently, but had finally refused to complete his purchase.

The defendant, in his answer, set out the will of the complainant's testator, and questioned their right to sell and to give a good title, under the will. He admitted that certain other portions of the property, where there were gore lots, were sold upon the terms mentioned in the bill as to the mode of computing the number of lots therein ; but he denied that the premises in question were put up in that way. On the contrary, he alleged, that when the premises as to the purchase of which a specific performance was sought in this case, were put up, being a tract of land, as appeared by the testimony, covered by the waters of a mill pond, and which was the last tract sold, they were put up as one lot, being block thirteen, and not in any other manner ; and that after one or two bids had been made thereon by other persons, the premises were struck off to him as one lot, being block thirteen, for the price or sum of $30. He further stated in his answer that he paid ten per cent upon this and his other purchases ; and that at the time he paid the same he obtained from the auctioneers a statement in writing, a copy of which was annexed to his answer, by which it appeared that each block and the number thereof as per map, and the number of lots bought by him in each block, with the price per lot, and the amount of the pur-

chase money for the lots in each block, were carried out and stated in separate and distinct lines; and that the aggregate amount of all his purchases was $14,925. And in that statement, block No. 13, the premises in question, was put down as one lot, and was carried out as purchased at $30 only. The defendant also set out in his answer the usual receipt of the auctioneers, signed by a person in their employ and for them, for the ten per cent, dated four days after the sale, setting out the various lots purchased by him, acknowledging the receipt of $1492,50, being ten per cent deposit, according to the conditions upon which his purchase of the lots and blocks specified therein were sold to him at auction for $14,925, and for which a good and sufficient title was to be given by the executors of Jordan Coles deceased; and stating that such deposit would, under no circumstances, be paid over to either buyer or seller, without their mutual consent and the production of that receipt. The answer further stated that such receipt was given up by him to one of the complainants, who gave to him another in lieu of it, acknowledging the receipt of the deposit, stating the terms and amount of the sales to him as in the auctioneers' receipt, and the aggregate amount of such sales, and for which, a good and sufficient title was to be given by the executors of Jordan Coles deceased, and that such receipt was given in exchange for the auctioneers' similar certificate; which receipt of one of the complainants was signed by him as executor of J. Coles.

The defendant also denied in his answer that he ever understood or admitted that block 13 had been purchased by him by the lot of one hundred feet by twenty-five; or that he ever conceded that the premises in question were purchased upon the terms stated in the bill; or that when the auctioneer's receipt for the deposit was given up and exchanged, he admitted there had been a mistake, and that he should have paid ten per cent on the map number of lots. He further stated his belief that the block 13 was not worth the $30 which he bid for it, as it was covered with water and would require to be filled up about seven-

1844.

Coles
v.
Bowne.

teen feet, according to the present corporation regulation of the streets in that vicinity. The answer stated also that the lines of the premises in question were indispute, between the complainants and M. Bryen the owner of the adjoining land ; in relation to which lines there was considerable conflicting testimony in the cause. Testimony was also taken as to the terms upon which this block was put up and sold ; and one of the witnesses who attended the sale swore that he understood the terms of the sale to be as stated by the defendant in his answer. The greater number of witnesses, however, supposed the block was put up by the lot of 25 feet by 100. But the auctioneer had no distinct recollection as to what occured at the sale, except from the entries in the books ; which entries were not made by him, but by a clerk who was at the time of the examination absent in one of the western states. And it appeared by the clerk of the auctioneer who received the ten per cent deposit, and who gave the receipt, and the statement of the lots sold to Bowne and the prices, that the entry in the book had been altered by the clerk who was then absent, after such statement was given, four days subsequent to the sale, by inserting 133, as the number of lots contained in that block, between the number of the block and the $30, bid by the defendant. But whether that alteration was made before or after the controversy arose between these parties, did not appear. The receipt given by the auctioneer's clerk, and the substituted receipt given by one of the complainants, was the only written evidence which was signed by either of the parties or their agents, showing the terms or conditions upon which the sale was made. All the other lots and parcels purchased by Bowne were paid for, and were conveyed to him, according to the terms upon which they were struck off to him at the sale.

The assistant vice chancellor decreed a specific performance, by the defendant, according to the claim made by the bill, with costs ; with liberty to the defendant, if he elected to do so within ten days, to have a reference to a master as to the title of the complainants.

*S. F. Clarkson,* for the appellant. As the agreement set forth in the bill is denied in the answer, the complainants were bound to prove such an agreement as was set forth in their bill, and that it was a valid agreement for the sale of lands ; viz. an agreement in writing and subscribed by the vendor or his agent. (1 *Hoff. R.* 470. 3 *Paige,* 478.) There was no proof of such an agreement. The complainants could not, under their bill, prove there was a mistake in a written agreement, to the end that it might be reformed and then specifically performed. To reform a written agreement for the sale of lands, by parol evidence, is inconsistent with the statute of frauds. (2 *R. S.* 135.) The admission of such evidence would defeat the object of the statute. (9 *Ves.* 239. 15 *Id.* 521. 1 *Sugd. on Vend.* 136 *to* 141, *Mass. ed.* 12 *Ves.* 446. 3 *Paige,* 478, 1 *Ves. jr.* 326, 330. 6 *Ves.* 329. 7 *Id.* 212. 1 *Molloy,* 359, 353. 2 *Atk.* 71. 10 *Ves.* 511. 3 *Bro. C. C.* 311. 2 *Atk.* 236. *Cowen & Hill's Notes to* 1 *Phil. Ev.* 539.) The bill is not framed with a view to the reforming and correction of an agreement. If this could be done under the bill, there is no evidence in the case which will warrant it. Where there is a misunderstanding as to the agreement between the parties, no decree for a specific performance should be made. (*Graham* v. *Henderson,* 5 *Munf.* 185. 1 *Ves. jr.* 211. 4 *Price's Ex. R.* 135. *Jer. Eq. J.* 367. 2 *Bro. C. C.* 420.) There has been no part performance to take the case out of the statute of frauds. None is alleged in the bill.

*W. K. Thorne,* for the respondents. The complainants do not seek to vary a written instrument. But they set up one agreement, the auctioneer's book, and the defendant sets up another, the mere receipt of a person in the auctioneer's employ. And the only question is, which is the true agreement. (5 *John.* 72.) The proof clearly establishes the allegations in the bill as to the sale. Even if the case was as insisted by the defendant, there is manifestly a mistake in the receipt produced by him ; and a mistake can

always be explained, and in this court corrected, and the agreement enforced as corrected. (*2 Edw.* 50.  1 *Story's Eq. Pl.* 171, § 159.   *Idem*, 164, § 152.   *Idem*, 167, § 155, note 1.   *Idem*, 168, § 156.   *Idem*, 175, *note* 1.   1 *Harr.* 540.)   Parol evidence is admissible to supply a deficiency, where a written agreement cannot be understood without such evidence. (1 *Story's Eq. Pl.* 171, § 159.   3 *Phil. Ev. Cowen & Hill's Notes*, 1485, 6, 1383, 4.   2 *John. Ch. R.* 585.)

THE CHANCELLOR.   From the testimony in this case I think it is very doubtful whether the premises in question were not set up in such a manner as to induce the defendant to suppose the block was to be sold together, as one entire parcel ; and without reference to the number of building lots which might possibly be made out of it if the mill pond, which overflowed the land, should be drained off and the bed thereof be filled up to the contemplated grade of the city.   The answer of the defendant, which is responsive to the bill in this respect, is corroborated by the testimony of Day, the city surveyor.   He was present when the premises in question were put up ; and he swears, that from what the auctioneer said at the time, he understood block 13 to be put up as one parcel, and to be sold altogether and not by the lot.   The auctioneer himself has no distinct recollection on the subject, independent of the entries in the book which were not made by himself.   And as it appears, from the testimony of Williams, that the entries in the books, as they now are, must have been made more than four days after the sale, no reliance whatever can be placed upon the books as evidence of a fact.   Two or three witnesses who were at the sale, however, think they have a clear recollection that this block was put up and sold by the lot, as the others were.   But to show how little reliance is to be placed on the recollection of any witness as to matters in which he had no immediate interest, nor any thing to impress them upon his mind at the time, or until long afterwards, one of the complain-

ants' witnesses who is most positive as to the manner in which this particular block was put up, and that it was struck off to the defendant at $30 for each lot of 2500 square feet, only recollects to have heard Mr. Bowne's name announced as the purchaser of one other parcel at that sale ; and he is not even certain as to that. Yet, it distinctly appears from the statement of the defendant's purchases at the sale, that at least seven distinct parcels were at different times struck off to him, at prices varying from $50 to $300, and amounting in the aggregate to nearly $15,000, besides the block in controversy in this cause. Among the parcels thus purchased by him was one entire blo ck, consisting of 29 lots and fractional lots, according to the map numbers, which were thus put down at the time by the clerk. And the number of lots were stated upon the book at the time, although some of them, as appears by the map, were fractional lots, upon which a computation was afterwards to be made, to ascertain the number of full lots. The fact that the number of lots in block 10 was put down by the clerk at the time, and that the number in block 13 was not thus put down, shows that there must have been some difference in the language used by the auctioneer in putting up the two blocks. In the one case, he probably put up block 10, consisting of 29 lots and fractional lots, and the clerk took down the same accordingly ; and in the other case put up block 13, without saying any thing as to the number of lots therein, or whether it was to be sold by the lot or as an entire parcel, and the clerk took it down accordingly. If so, the defendant and the witness Day may have supposed it was intended to be put up as an entire parcel, as they both swear it was, although the other witnesses understood it otherwise. I have no doubt, however, that it was the intention of the complainants and probably of the auctioneer to put it up by the lot, and that the complainants honestly believed it was so put up. For they had taken the trouble to have it laid out upon a map and lithographed, as consisting of 134 building lots and fractional lots. Al-

though it appears to have been a mere mill pond and not worth the expense of filling up for city lots, and may not be for the next fifty years, it must be recollected that this sale took place in June, 1836, when thousands of our fellow citizens, who were esteemed discreet and prudent men, considered the most worthless quagmire or frog pond, if situated within two or three miles of any of our principal cities, as immensely valuable for the purpose of building lots. And one of the witnesses thought of purchasing this pond at the nominal price of two or three thousand dollars, if he could get it in exchange for other property at the same rate as to price and value. But I do not understand any one of the witnesses to say that he believes the whole block is intrinsically worth, for building lots, what the defendant puts it at in his answer; a sum less than the $30 which he says he bid for the block as one entire parcel. I presume the defendant thought at the time he had made a great speculation. Or if he did not, I can well imagine there were others at that sale, and who had arrived at what is usually considered years of discretion, who actually expected to live until the site of this pond was covered with valuable buildings; and who perhaps anticipated that before this time the progress of improvement would have been such, that stately merchant ships would be riding at anchor in what was then known by the humble name of Gawannus creek. But the doubt upon the question as to whether both parties understood the agreement implied from the defendant's bid, alike in this case, is so great, that I think the court ought not to decree a specific performance in favor of either, according to his or their respective understandings of the contract, even if a parol agreement for the sale of lands, not subscribed by the parties by whom the sale was to be made or by their agent lawfully authorized, was valid under the provisions of the revised statutes.

Although this would be sufficient of itself, to make it my duty to reverse the decree appealed from, it may be proper to consider the question arising under those statutory provisions, in reference to the claim of the respondents

for the specific performance of the contract as stated in their bill.

Where the complainant in his bill sets up an agreement which by the statute of frauds would be invalid unless it was in writing, and subscribed according to the provisions of the statute, the legal presumption is that it was in writing, unless the contrary is stated in the bill. And if the agreement, as stated in the bill, is denied by the answer of the defendant, the complainant must produce legal evidence of the existence of such an agreement upon the hearing; which can only be done by producing a written agreement, duly executed according to the provisions of the statute. (*Cozine* v. *Graham*, 2 *Paige's Rep.* 17. *Ontario Bank* v. *Root*, 3 *Id.* 478.) Where the agreement is of such a nature as to authorize this court to correct any mistake which has been made therein, if the written agreement does not in fact contain the true agreement between the parties, the complainant, when he wishes to introduce parol proof to correct it, should not merely state the agreement as it ought to have been reduced to writing, but he must also state the substance of the written agreement. And he must show wherein it differs from the one actually made; so that if the alleged mistake is denied in the answer, the testimony may be directed to the question whether a mistake has or has not occurred in reducing the agreement to writing. The party alleging the mistake, in such a case, holds the affirmative; and he must satisfy the court beyond all reasonable doubt that such an agreement as he claims to have been made was in fact made between the parties, and that either by fraud or accident a mistake has occurred in reducing the agreement to writing. Whether a party can come into this court for the specific performance of a mere executory agreement for the sale of lands, which in its terms is materially variant from the written agreement between the parties that has been executed according to the statute, and where there has been no part performance or other equitable circumstance sufficient to take the case out of the statute of frauds, as a mere

parol contract between the parties, is a question which it will not be necessary for me to consider in this case.

The former statute of frauds provided that no action should be brought whereby to charge any person upon any contract or sale of lands, &c. or of any interest in or concerning them, unless the agreement or some note or memorandum thereof should be in writing and signed by the party to be charged therewith, or by some person thereunto by him or her lawfully authorized. (1 *R. L. of* 1813, *p.* 78, § 11.) Under this statute, and under a similar provision in the statutes in England and in our sister states, it was held that the literal act of signing was not necessary, but that it was sufficient if the name of the party was written by him, or by his authority, in any part of the agreement or memorandum of the same. And it was a disputed question, both in England and in this country, whether an auctioneer was the agent of both parties, so as to make his written memorandum of the terms and conditions of the sale, and of the names of the parties thereto, entered in his book at the time of such sale, a sufficient signing of the agreement by the agent of both parties, within the intent and meaning of the statute. (*Walker* v. *Constable,* 1 *Bos. & Pull.* 306. *Buckmaster* v. *Hanop,* 7 *Ves.* 344. *Coles* v. *Trecothick,* 9 *Id.* 249 ; 13 *Id.* 472, *S. C. Hamsfield* v. *Johnson,* 1 *Esp. Rep.* 101. *Emerson* v. *Heelis,* 2 *Taunt.* 28. *White* v. *Proctor,* 4 *Id.* 209.) In the two last cases it was settled in England, contrary to what had formerly been understood to be the law there, that the auctioneer was the authorized agent of both parties in making a contract for the sale of real estate, as well as on a sale of goods ; so as to make his entry of the agreement in his books, at the time of sale, binding upon both.

These decisions were afterwards acquiesced in by Sir William Grant, and by Lord Eldon in the case of *Kemeys* v. *Proctor,* (3 *Ves. & Bea.* 57, 1 *Jac. & Walk.* 350, *S. C.*) though contrary to their previous opinions. The same decision was made by Chancellor Kent, in *McComb* v. *White,* (4 *John. Ch. Rep.* 659.) And it has since been held in

England that the bidder at an auction sale is bound by the entry in the sale book by the auctioneer's clerk, made in the presence of such bidder, upon his name being called out as the purchaser. (*Bird* v. *Boulter*, 1 *Nev. & Man. Rep.* 313.)

But under the provisions of our revised statutes, a mere memorandum in the auctioneer's books, made by him, or his clerk under his direction, specifying the property sold, the price, the terms of the sale, and the names of the vendor and the purchaser, is not sufficient to make a valid and binding contract for the sale of land ; though it is expressly declared to be sufficient in relation to a sale of goods. (2 *R. S.* 136, § 4.) The eighth and ninth sections of the title of the revised statutes in relation to fraudulent conveyances relative to lands, declare that every contract for the sale of lands, or any interest in lands, shall be void unless the contract or some note or memorandum thereof, expressing the consideration, be in writing and be subscribed by the party by whom the sale is to ·be made, or by the agent of such party lawfully authorized. And the court for the correction of errors, in the recent case of *Davis* v. *Shields*, (26 *Wend. Rep.* 341,) decided, that to constitute a subscription of the contract, within the meaning of the statute, the name of the party or his agent must be signed below or at the end of the contract, or of the memorandum thereof. In the case under consideration, the only notes or memorandums of the terms of the sale which purported to be subscribed by any persons as the vendors of the property, were the receipt signed by Williams " for Bleeker & Sons," the auctioneers, and the substituted receipt of W. K. Thorn, as one of the executors of J. Coles. But neither of these receipts expresses either the terms or conditions, or the consideration of the sale of the particular block which is in controversy in this suit. Nor is there any thing upon the map, exhibit C. to which it refers, to designate the boundaries of block 13, or to show whether the block included the whole 134 lots and fractions of lots to the north of Coles' street, or only the 110 lots which lie east of

the nameless street which is drawn at right angles with Cooper street.  Neither would correspond with the description of the premises which are stated in the complainant's bill to have been sold to the defendant.  The bill does not describe the land sold as block 13 ; which was the description by which it was put up for sale, as I understand from the testimony of the witnesses, and which was the description of the parcel as entered on the sale book.  But the complainants, in their bill, say that the defendant became the bidder, and was declared to be the purchaser of the following premises : " All those certain lots, pieces or parcels of land known and distinguished on a map of the property belonging to the estate of Jordan Coles, &c. by the numeral numbers from 1 to 133 inclusive ;" thus leaving out fractional lot No. 134, which in the vice chancellor's decree is considered as a part of block 13.  The auctioneer's clerk, therefore, when he afterwards amended the entry in the book, by making what he had originally carried out as the price of the whole block 13 applicable to each of the lots and fractional lots within the supposed bounds of that block, did not make his entry according to the contract of sale as proved by the complainant's witnesses.  And if the entry in the sale book corresponds in substance with exhibit B., which is the only extract from that book with which I have been furnished, it was defective in not stating that these 133 lots, which by the new entry were put down as sold to the defendant at $30 a lot, were not sold as full lots ; but that those which contained less than 2500 square feet were only to be paid for in the proportions which their actual contents bore to a full lot.  I am satisfied, therefore, that there was no valid contract in writing, for the sale of the premises described in this bill, either according to the provisions of the revised statutes, or even as a compliance with the former statute of frauds.

The decree appealed from must be reversed ; and the bill of the complainants must be dismissed with costs in the court below, but without costs to either party upon this appeal.  The costs to be paid by them out of the fund

arising from the sales made by them as executors, or other funds belonging to the estate of the testator, in their hands.