Davis, J.,
delivered the opinion of the court:
This case comes before the court as a court of equity, under the provisions of “An act for the relief of James W. Harvey and James Livesey, of the firm of Harvey & Livesey, of Wisconsin,” approved August 14,1876, of which the following is a copy:
“Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, That the claim of James W. Harvey and James Livesey for alleged labor done and materials furnished under their contract with the United States for the building of the masonry work for the piers and abutments of the bridge across the Mississippi Biver from Bock Island to Davenport, Iowa, bearing date June first, eighteen hundred and sixty-nine, be, and the same is hereby, referred to the Court of Claims for hearing and adjudication; and to that end jurisdiction is hereby conferred on said court to proceed in the adjustment of the accounts between said claimants and the Hnited States as a court of equity jurisdiction, and may, if according to the rules and principles of equity jurisprudence, in its judicial discretion, reform said contract, and render such judgment as justice and right between the claimants and the said Government may require.”
In the month of May, 1869, Brevet Brigadier-General Bodman, lieutenant-colonel of ordnance, in command of the Hnited States Arsenal at Bock Island, Illinois, caused to be published the following advertisement in pursuance of law:
*324 “PROPOSALS POR BRIDGE MASONRY.
“ Sealed proposals will be received at tbis arsenal up to 10 o’clock a. m. on tbe 25tb day of May, 1869, for tbe construction of tbe piers and abutments of tbe railroad and wagon-road bridge to be built to connect tbe island of Bock Island witb tbe city of Davenport.
“ It is proposed to build, say, five common piers, one draw-pier, and two abutments. Tbe stone and cement required for tbe work will be furnished on railroad cars on arsenal SAvitcb near tbe island and at tbe proposed bridge, and the sand required for tbe cement will be furnished by tbe United States at or near tbe same point.
“All masonry must be of tbe best quality of bridge masonry; tbe stones in each course must be well loaded, and each course well secured by dowels to the course below under cut-water and at lower end of piers, and tbe foundation-course must be fairly bedded and well secured to tbe rock-bed of tbe river; tbe work, as it progresses, being subject to tbe inspection and approval of tbe commanding officer of tbe arsenal, or such other officer or person as may be designated by proper authority.
“Detailed information witb regard to tbe general form and dimensions of tbe piers and abutments, and a profile of bed of river, can be obtained by personal application at tbe arsenal.
“Tbe total amount of masonry is estimated at about 10,000 cubic yards. All tbe piers and abutments will be required to be completed prior to tbe 1st day of December, 1869.
“Parties making bids will state the price per cubic yard of solid masonry at which they are willing to complete tbe ivork, tbe United States furnishing tbe stone, cement, and sand,’ as above stipulated, and nothing more.
“They will also make a bid, stating separately tbe price per cubic yard of solid masonry at which they will undertake to build tbe piers and abutments, tbe United States furnishing stone, cement, and sand, as above, and tbe price at which they will agree to put in tbe necessary coffer-dams, with their protections.
“Proposals will be indorsed‘Proposals for bridge masonry’ and addressed to tbe undersigned.
“Tbe United States reserves tbe right to reject any bid not deemed satisfactory.
“ T. J. EODMAN,
“ Lieutenant-Colonel of Ordnance, and “Brevet Brigadier-General, TJ. 8. A., CommcmdingP
General plans of tbe proposed piers and abutments, and a profile of tbe bed of tbe river, were prepared by General Eod-man for tbe examination of persons proposing to bid. General *325 Rodman also prepared an estimate of tbe probable cost of tbe bridge complete, including tbe sand, stone, and cement for tbe masonry. Tbis estimate ivas prepared for tbe use of tbe defendants’ agents at Washington, and does not appear to bave come to tbe claimants’ knowledge until furnished in answer to tbe call of tbis court on motion of the claimants’ attorney. It related to three forms of structure, one for a double-track railroad, with a wagon-road over it; one for a single-track railroad, with a wagon-road over it; and one for a single-track road,-with a wagon-road under it. In each tbe masonry was estimated at $24 tbe cubic yard, including tbe sand, &c., as above.
Only two sets of bids were offered in response to tbe advertisements. One set, by Reynolds, Saulpaugh & Co., following tbe terms of tbe advertisement, bid, for “ solid masonry, $19.10 per cubic yard, in tbe work complete, tbe United States furnishing tbe stone, cement, and sand, as stipulated, and nothing more” and, as “per second plan,” “solidmasonry, at $12.70 per cubic yard in tbe work complete, tbe United States furnishing the stone, cement, and sand,” “and build tbe coffer-dams” for $03,700.
Tbe other bid was made by tbe claimants, and was in tbe following form: “We propose to build tbe masonry of piers and abutments of tbe Rock Island Bridge as per annexed advertisement: small piers and abutments, per yard, $11; draw-piers and abutments, per yard, $13.”
Tbe bids were opened some time in tbe month of May, 1869, at General Rodman’s office, on Rock Island, both tbe claimants and General Rodman being present. After opening tbe bids, General Rodman said that tbe bid of Reynolds, Saulpaugh & Co. was high, and that tbe claimants’ bid was very low, and be asked tbe claimants if they understood what they were bidding on or understood their business, and whether their bondsmen knew'? They answered that they did. General Rodman then said that be would look over tbe bids again and let tbe claimants know in a few days.
One John L. Davies, a lumber manufacturer, was also present at tbe opening of said bids, and, following tbe claimant Harvey out of General Rodman’s office, be asked him “ when be got ready to buy bis lumber for coffer-dams” to give him (Davies) a call. Harvey replied that be would.
Tbe claimants’ bid was accepted. A contract was then *326 draughted by one of General Bodman’s clerks. A rough, draught of this was submitted to the claimants, and on their returning it as satisfactory, the engrossed copies were prepared for signature, and the contracts were executed and interchanged, bearing date the 1st day of June, 1869.
The following clauses contain the only parts material for our present consideration:
“ The parties of the first part do hereby contract and engage with the said United States to construct the piers and abutments for the new rail and wagon bridge to be built to connect the island of Bock Island with the city of Davenport in accordance with such plans and specifications as may be fixed by proper authority, acting for the United States. The United States to furnish stone, cement, sand, and all necessary templets required for the work, and nothing more. * * * The character of the work to be daily inspected, as it progresses, by such officer or other person as the commanding officer of the Buck Island Arsenal or other authority appointed by the United States may designate; such inspector to have full authority to give any directions with regard to the character or manner of conducting the work. The whole work to be completed prior to the first day of December next, provided that the stone shall be delivered at the rate of.2,000 cubic yards per month; and in case of any failure on the part of the United States to deliver this amount of stone, then the work to be completed as soon after the first day of December next as practicable. * '* * Payment in such funds as the Treasury Department may provide, at the rate of thirteen (13) dollars per cubic yard for all masonry in the draw-pier and at the rate of eleven (11) dollars per cubic yard for all other masonry. * * * ”
“It is further stipulated and agreed, that if any default shall be made by the parties of the first part in the performance of their work specified in this contract, of the quality and at the times and places therein provided, that then, in that case, the United States shall have the right to take entire and exclusive charge of the work and to complete it in accordance with the conditions prescribed in this contract, charging us with the entire cost of completing it, and crediting us with the amount per cubic yard heretofore stipulated to be paid us for the completing of the work.”
On the 6th June, 1869, the claimants began preparations for the prosecution of work under the contract. Stone furnished by the defendants for the work was then arriving by railroad, and the claimants set men to work cutting it.
On or about the 17th July, 1869, the charge of the construction of the said bridge was transferred from the Ordnance Bureau to the Bureau of Engineers, in the War Department, *327 and General Bodman, of the former branch of the service, was relieved by General Warren, of the latter branch, and General Bodman has since died. Just before or about the time of the transfer, the claimants purchased of a contractor who had been building a bridge at Quincy a large amount of machinery in mass for bridge-building, including, among other things, a pile-driving boat, with engine and boiler and necessary apparatus for pile-driving, and two flatboats. This machinery arrived at Bock Island before the 21st day of July, 1809, and the engine, which had on it a proper rigging for running pumps, was subsequently used there for pumping out the coffer-dams. On the 22d day of the same July, the claimants were notified of the change which had taken place in the direction of the work, and were ordered to suspend work until further instructions. This suspension was made in order to enable General Warren to make further examinations, so as to reduce the cost of the proposed structure by a change in the plans and specifications. On the 31st of the same July,' the claimants were notified, by direction of General Warren, that they could proceed with the work; but it was not until the 22d of the following August that any new plans and specifications were determined upon by the officers of the United States charged with the construction of the bridge, and then bnly the plans for the Iowa abutment and pier.
Between the 22d of July and the 23d of August, 1869, Major Sticknoy, the officer in immediate charge of the construction, saw the claimants three or four times. The claimants at these interviews made no suggestion that the defendant was bound to construct the coffer-dams. It does not even appear that cofferdams were mentioned in the interviews. On the 23d August, as is testified by Major Stiekney, the claimants had made no “preparations for building dams, with the exception of an engine-boat ; that is, a boat with an engine and pile-driver on it.” About that time thej' commenced “building a crib to serve as a breakwater,” and also began “to construct a dredging-machine, which was attached to their engine-boat, to procure filling for the walls of the dam.” The dredging-machine was completed and attached to the boat and connected with the steam-engine prior to the 13th of the following September. Before the last-named day the claimants also had on the ground “material for coffer-dams, considerable of which had been prepared to put in the dam.”
*328 On the 4tb day of September, 1860, tbe claimants were furnished with the first working-plan under the new plan and specifications by General Warren. These new plans and specifications varied materially from those by General Rodman in several respects. The variation, which under the rulings of this court, to be hereafter noticed, is the subject of controversy in this suit, consists of a narrowing in the breadth of the piers, whereby the amount of expensive stone work in the cut-facings was but slightly decreased, while the quantity of rough work for backing and filling, which was less expensive work, was decreased in much greater proportion. The latter in all the masonry was reduced one-half. The dimensions of the necessary coffer-dams were also proportionately reduced. The general nature of the changes are stated by the testimony of General Warren. It is not necessary to refer to them in detail.
On or about the 4th day of September, 1869, one of the claimants informed Major Stickney that, in the opinion of the claimant, the United States should construct the coffer-dams. Major Stickney, in his account of the interview, adds that at that time the claimant u merely expressed an opinion, and made no claim that the United States should do this work.”
In two or three conversations which took place between Major Stickney and the claimants, between the 4th and 13th September, 1869, they said that they thought that the United States ought to pump out the water and prepare the beds for the masonry, and they, or one of them, stated that they thought the Government should build the dams. Stickney told them that he did not agree to their position.
The claimants also complained to Major Stickney in conversations, the date of which is not given, that “ the masonry was greatly reduced from what it would have been according to the plans of General Rodman, and that this reduction bore hard upon them, especially because the main amount of the reduction was in backing or rough work, and they requested that they should be allowed more pay for the work done in order to make up for the difference in the quantity. He told them that he could not pay except in accordance with the contract, but that he was willing to recommend that they should receive some compensation for this difference.”
On the 13th September, 1869, the claimants addressed and sent to General Warren a letter in the following words:
*329 “ SEPTEMBER 13, 1869.
“ Sir : Not waiving any damages tbe undersigned may bave suffered by reason of tbe delay on tbe part of tbe United States, we are now ready to construct tbe piers and abutments for tbe new rail and wagon bridge to be built to connect tbe island of Bock Island with tbe city of Davenport, under tbe contract entered into by tbe United States on tbe one part, and tbe undersigned on tbe other part, dated tbe first day of June, one thousand eight hundred and sixty-nine; and we hereby request that tbe United States shall' forthwith construct tbe requisite coffer-dams, exhaust tbe water therefrom, and prepare tbe bed for said piers and abutments where necessary for tbe commencement of said work.
“ Very respectfully, yours,
“ HARYEY & LIYBSEY.
“ Brevet Major-General G. K. Warren,
‘•Major of Engineers,* United States Army.”
This letter ivas received by Major Stickney on behalf of General Warren on tbe day of its date. On tbe next day, Major Stickney replied to it as follows:
“ Oeeice op the Book Island Bridge,
“ Boole Island, III., September 14,1869.
“ Gents. : Your letter of tbe 13th inst., addressed to Brevet Major-General G. K. Warren, was received yesterday, and be has directed me to say that, after fully considering the subject of your letter and tbe contract entered into between yourselves and tbe United States, we are fully convinced that you, and not tbe United States, are required by said contract to construct tbe requisite coffer-dams, pump tbe water from tbe same, and prepare tbe beds for tbe piers and abutments.
“ Yery respectfully, your obedient servant,
“AMOS STICKNEY,
“ Captain of Engineers, Brevet Major, U. S. Army.
“ Messrs. Harvey & Livesey.”
On tbe 15th of September tbe claimants addressed and sent to General Warren tbe following written protest:
“ September 15,1869.
“ Sir : Whereas tbe undersigned claim that, under tbe contract entered into by tbe United States on tbe one part, and tbe undersigned of tbe other part, dated tbe 1st day of June, one thousand eight hundred and sixty-nine, to construct tbe piers and abutments for tbe new rail and wagon bridge to be built to connect tbe island of Bock Island Avitk the city of Davenport, tbe United States are obliged to build tbe requisite coffer-dams, *330 pump tbe water therefrom, and prepare the beds, where necessary, for said piers and abutments ”;
“And whereas, on the 13th day of September, A. D. 1889, we made demand in writing on the United States to build said dams, pump the water therefrom, and prepare said beds”:
“And whereas the United States did then aiid there, in writing, on the 14th day of September, refuse either to build said dams, pump the water therefrom, or prepare said beds”:
“Now, therefore, we do hereby protest against such refusal of the United States to build said dams, pump the water therefrom, and prepare said beds; and do hereby notify the United States that we shall proceed at once to build said dams, pump the water therefrom, and prepare said beds, and shall hold the United States for the payment of the costs and expenses of the same.”
“ Yery respectfully, yours, &c.,
“1IABYEY & LIYESEY.”
“Brevet Major-General G. K. Wabken,
“ Major of Engineers, TJ. 8. Army.”
Upon a copy of said protest, returned to the claimants, the following indorsement was made by General Warren:
“Beceived, this 15th day of September, A. D. 1869, the original whereof this is a copy. And in order not to delay the work, I consent to the work going on until the matter can be referred to the United States Attorney-General; but in this consent it must be considered that nothing is admitted in favor of the claim of the contractors to their interpretation of the contract.”
“G. K. WABBEN,

“Major Engineers cmd Brevet Major-Qenerctl, U. 8. Army,

In charge construction of bridge.”

General Humphreys, Chief of Engineers, approved of the construction put upon the contract by Major Stickney in his letter of September 14, and his decision was communicated to the claimants on the 10th day of the following November. Meanwhile the claimants went on with, the work on the coffer-dams. Immediately upon the refusal of the officer in charge of the work to build them, and to pump the water therefrom, and prepare the beds for the abutments and piers, they proceeded to build the requisite coffer-dams; and all that was required in that respect while the work was in the hands of the claimants was done by them. All the materials for the coffer-dams, including sand and stone, were furnished by the claimants at their own expense. It did not axipear what amount of sand was thus furnished by the contractors. The claimants built eight entire coffer-dams and three x>arts of dams. There were about fifty *331 yards of loose stone used in each protecting crib, and there were somewhere between 15 and 20 such cribs. The Government did not furnish any of this stone, but the contractors took stone out of the stone-yard to build some of their cribs. It appeared that the claimants paid the defendants for 259 cubic yards of stone spawl used for that purpose. One Addison M. Scott testified that some time in the spring of 1870, the claimant, Livesey, said to him that “ the claimants’ intention was to build these dams, until they found that if they did so they were also obliged to make the excavations and prepare the beds. After they discovered this, they concluded to deny the intention of building the coffer-dams. He (Livesey) also said that they had no intention when they took the contract of making the excavations or preparing the beds.” The cost of making said excavations appears to have been $1,883. The cost of preparing said beds was small compared with the cost of the coffer-dams. The cost of the construction of the coffer dams is variously estimated from $25,000 to $125,000. The officers of the defendants testify that it is undoubtedly more difficult and expensive to construct and build the coffer-dams and protection and all the work incident thereto,- to make them ready to receive the masonry, than it is to prepare and set the masonry.
The work did not advance to the satisfaction of the defendants. On the 6th day of October, 1870, the claimants were notified in writing, by the officer in charge of the work on the bridge, that, in consequence of complaints that had reached the Chief of Engineers, United States Army, of the tardy progress of the work upon the masonry of the bridge, the officer had been required to take suitable and efficient measures to expedite the work; and, in view of that requirement, he informed the claimants that he would take the work as it stood and carry it on under the provision of the contract, which contemplated such a change. On the 7th of the same month, the claimants, in writing, refused to give up said work; whereupon, on that day, the officer notified them, in writing, that he would, the next morning at seven o’clock, take possession of the work for the Government, which he did; and thenceforward the work was prosecuted by the officers of the Government. The claimants, at the time of such taking possession, made written protest against it, and demanded permission to • complete the work according to contract, and, in default thereof, announced that they should hold the United States for all damages sustained.
*332 Tbe claimants thereupon, on the 14th December, 1870, filed their petition in this court, claiming to recover of the defendants the following amounts:
“1. For damages incurred by reason of the unreasonable delay caused by defendants, from 7th June, 1869, to September 4, 1869.$25,000
“2. For putting in coffer-dams and protections for pumping the water therefrom and for preparing the beds for the piers and abutments. 75,000
“3. For loss of profits incurred by the unlawful reduc- • tion of the dimensions of the piers and abutments. 33,600
“4. For increase on the cost of work, by having been compelled to do it in cold weather.. 15,000
“ 5. For constructing 4,400 cubic yards of masonry, at, • say, $12 per yard. 52,800
“6. For loss caused by n eglect of defendants to furnish materials and locate piers and abutments, whereby the plaintiffs, their workmen and tools, were kept idle. 15,000
“ 7. For loss of machinery, vessels, and tools, caused by the ejectment of the plaintiffs from the work... 25,000
“ 8. For dressing coping and corners of abutments and dressing noses of piers under water (not required by contract). 5,000
246,400
“ Deduct cash payment. 46, 000
“$200,400”
The claimants prosecuted their said suit; and at December term, 1872, this court announced, its findings of fact therein and the following conclusions of law thereon:
“ 1. That the contract sued upon did not require the United States, but required the claimants, at their own expense, to put in coffer-dams and protections and to pump the water therefrom, and to prepare the beds for the piers and abutments which the claimants agreed to build.
“2. That the reduction made in the dimensions of the piers and abutments of said bridge, as originally projected, was not, by the legal construction of the contract, wrongful to the claimants.
. “ 3. That the claimants did not sustain any damage by reason of the idleness of their tools, machinery, and vessels, after the 8th of October, 1870, which they would not have sustained had they on that day completed their work under said contract, or which was not incident to the termination at any time of their work under said contract.
“ 4. That the claimants are not entitled to any recovery under *333 tbe second, third, fourth, seventh, or eighth items of their demand, as stated in the petition.
" 5. That the claimants are entitled to recover of the defendants the sum of $42,306.49.”
And judgment was rendered for the recovery of the last-named sum.
Congress thereupon enacted the law already referred to. Availing themselves of the jurisdiction thus conferred, the claimants, on the 30th day of August, 1876, brought suit in this court against the United States, setting forth their original petition and the proceedings therein, and the payment of the judgment rendered therein, praying to have the contract reformed in accordance with the intent of. the parties, and demanding the recovery of the further sum of $239,600, according to the following specifications:
“1. For labor done and materials furnished by the plaintiffs in constructing the coffer-dams, and in performing the work necessarily connected therewith, and preliminary to the masonry work for said piers and abutments .. $75,000 00
“ 2. For loss and damages resulting to the claimants in consequence of the reduction of the dimensions of the piers and abutments, made subsequently to the making of the contract. 33,600 00
“3. For loss of machinery, vessels, and tools, caused by taking from the plaintiffs the work under their contract. 25,000 00
“ 4. For extra work — dressing coping and corners of abutments and dressing noses of piers under water (this work not being required by the contract ... 5,000 00
“ 5. For the profits they could have made had they been permitted to build the cross-walls and crib-work connecting the upper and lower rests with the pivot (part of the contract) .. 48,000 00
“ 6. For profits they might have made had they been permitted to construct the wing-walls for the Iowa shore abutment. These walls were ‘ riprap,’ and a part of the work under the contract, out of which liberal profits could have been made; the agents of the United States performed ■ the work_-.... 3,000 00
“7. For profits they might have made had they been permitted to complete the work according to the intention of the parties and the terms of the contract, in addition to the foregoing charges. 50,000 00
$239,000 00
*334 •“ 8. For interest on tbe amount found due to tbe plaintiffs on an equitable adjustment of accounts between tbe parties, from October 6,1870, until tbe date of tbe judgment of tbis court, at tbe rate of six (6) per centum per annum.”
Tbe defendants demurred to tbis petition; and tbis court, on argument, beld tbat “ tbe purpose of tbe statute was to supply a defect and not to duplicate litigation”; tbat tbis court was “to act as a court of equity, and not to act, as it before might have acted, as a court of law,” and therefore “ what has been done is to remain fixed, and what before could not be done is to be tbe sole subject of judicial ascertainment.” “ Tbe relief which it may give must be limited to matters not before determined.” (12 C. Cls. R., 141.) Tbe demurrer was therefore sustained, with leave to tbe claimant to file an amended petition. Under tbis ruling an amended petition was filed. Tbe present proceedings, therefore, relate only to tbe claims for tbe cost of tbe coffer-dams and for tbe loss of profits resulting from tbe reduction of tbe dimensions of tbe piers and abutments, tbat is, claims No. 1 and No. 2 on tbe last-named list. At tbe trial on the merits in equity, the parties offered tbe identical evidence which was offered at tbe bearing of tbe case at law and no other.
In support-of their demand tbat tbe contract should be reformed in equity, tbe claimants aver, as to tbe coffer-dam, tbat tbe sum bid by them was manifestly compensation for tbe masonry alone, exclusive of tbe dams, and they cite tbe estimates of General Bodman and tbe bid of Beynolds, Saulpaugb & Go. in support of tbe averment. Had tbe language of tbe proposals and their own bid formed tbe sole evidence of tbe contract, it would, they say, taken in connection with tbe Bodman estimate, and tbe Beynolds bid, and tbe manifest insufficiency of their own bid to cover tbe cost of both masonry and cofferdams, inevitably have forced a court to tbe conclusion that both parties contemplated that tbe coffer-dams were to be built by "the United States. They say tbat. tbe parties put this construction upon tbe contract in practice. Tbe United States were to furnish stone, sand, and cement for tbe masonry. If tbe coffer-dams were included in tbe contract for tbe masonry, these articles, when used in tbe dams, should have been furnished by tbe defendants. They were, however, furnished by tbe claimants, who even paid tbe defendants for some loose *335 stone from the arsenal yard wbiob was used in them. Therefore, they argue, the written contract does not, in this respect, express the true agreement between the parties, and a court of equity should reform it and make it express it.
In reply to this, the defendants refer to General Hodman’s conversation with the claimants when the bid was opened; to the conversation of Davies with them respecting the furnishing of lumber to build the dams; to the conversation between Livesey and Scott, in which the former said that the claimants supposed they were to build the coffer-dams, and had at one time intended to build them without question; to the apparent acquiescence of the claimants -in this construction • of the contract, by purchasing in the summer of 1889 materials for the dam and machines to be used in its construction; and to the undisputed fact that until they saw General Warren’s drawings and plans and discovered that the shapes of the piers were materially changed to their detriment, the claimants made no pretense that the defendants were to build the coffer-dams. From all this the defendants argue that there was neither mistake nor accident in the reduction of the contract of the parties to writing-on the 1st of June, 1869; but that, on the contrary, it expresses, as construed by this court in the former suit, the exact intent of both parties respecting the coffer-dam.
With reference to the loss of profits by the reduction of the piers, the claimants say that General Bodman’s proposals and their bid referred to a definite thing — the piers and abutments planned by General Bodman; that the acceptance of their proposals by General Bodman made the real contract between the parties; that the subsequent written contract was intended by both parties to carry into execution the contract thus agreed to, and that it was not the purpose of either party to permit the officers of the United States to materially vary the pians for the piers so as to essentially change the obligation of either. Therefore, they say a court of equity should construe the clause in the contract of June 1, which required the claimants to construct the proposed piers and abutments in accordance with plans and specifications to be' fixed by proper authority acting for the United States, as not permitting such authority to prescribe piers and abutments essentially different from those planned by General Bodman.
The defendants deny that the written contract does not ex *336 press tlieir intent in this respect, and say, further, that whether it does or does not express it, no equity jurisdiction is conferred upon this court to reform it in regard to this point. The Act of August 14,1876, they say, refers to this court the claim of Harvey & Livesey for alleged labor done and materials furnished under their contract and nothing more, and the equity jurisdiction is conferred upon this court only “ to that end.” The injury for which the claimants seek relief in consequence of the change in the form of the piers is in no respect, they say, a claim for labor done and materials furnished, but a claim for a loss of profits by reason of not furnishing materials and of not doing labor, which is quite naother thing. Therefore, it is argued it is not within the statute, and this court has no jurisdiction over it.
We have been thus minute in tracing the history of this litigation and the facts proved in the course of it and the contentions of the respective parties, because, in the absence of the customary findings of fact, such minuteness seemed necessary to the comprehension of the conclusions which we reach.
The claimants failed to satisfy us that the written contract of June 1 does not express the intent of both parties as to the coffer-dams; and, the burden of proof being upon them to do so, their action falls to the ground on this point. In face of the array of positive, unexplained, and unimpeached testimony to the contrary, we cannot deduce from circumstances, however reasonable or probable in themselves, that the claimants did not intend to build the coffer-dams when they signed the contract of June 1; and even were we satisfied that the claimants executed the contract of June 1 in mistake of their rights, there is no evidence that the defendants shared the mistake. The following, familiar doctrine of equity, well stated in a case relied upon by both parties at the trial (Hearne v. Marine Ins. Co., 20 Wall., 488) is fatal to the claimants on this point:
“Where the agreement as reduced to writing omits or contains terms or stipulations contrary to the common intention of the parties, the instrument will be corrected so as to make it conform to their real intent. The parties will be placed as they would have stood if the mistake had not occurred. (Kerr on Fraud and Mistake, 419, 420.) The party alleging the mistake must show exactly in what it consists and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. (Beaumont v. Bramley, 1 Turn. & R., 41-50; Marquess of Breadalbane v. Marquess of Chandos, 2 Myl. & Cr., *337 711; Fowler v. Fowler, 4 De. G., & J., 255; Sells v. Sells, 1 Drew. & Sm., 42; Loyd v. Cocekr, 19 Beav., 144.) The mistake must be mutual aucl common' to both parties to the instrument. It must appear that both have done what neither intended. (Rooke v. Lord Kensington, 2 Kay & J., 753 ; Eaton v. Bennett, 34 Beav., 196.) A mistake on one side may be a ground for rescinding, but not for reforming-, a contract. (Mortimer v. Shortale, 2 Dr. & War., 372; Sells v. Sells, supra.) Where the minds of the parties have not met there is no contract, and hence none to be rectified. (Bentley v. McKay, 31 L. J., Ch., 709; Baldwin et al. v. Mildeberger, 2 Hall, 176; Cowles v. Browne 10 Paige, 534; Calverley v. Williams, 1 Ves., jr., 211.)”
In regard to the piers, the evidence goes to show that the claimants, as soon as they comprehended the changes made by General Warren in General Bodman’s plans, did assert that the changes wore to their detriment and in violation of their rights. On the defendants’ side, the evidence goes to show that their agent at Bock Island recognized the justice of the claimants’ assertion, as to the operation of the changes, and advised that they should be compensated for them. The contract, it will be remembered, was made by the Bureau of Ordnance; the changes in the plans by the-Bureau of Engineers. The decision of General Warren as to the legal effect of the contract was made on the 14th of September, and was communicated to the claimants, with a consent that the work might go on until the matter could be referred to the Attorney-General. It was not until the 10th November that the Govermneiit’s answer was communicated to the claimants. In view of the prompt action of the claimants on ascertaining- the nature of the changes, of the admissions of the defendants’ agents that the changes were burdensome and inequitable, of the long- delay in the decision of the case at Washington, and of its final decision apparent^ on strictly legal grounds, we should be disposed to regard this as a case for equitable interposition, for the purpose of further-inquiry and the ascertainment of the rights of the parties in equity, if we felt that we had jurisdiction. It is clear, however, that the statute does not authorize us to entertain these considerations. In these proceedings we can only hear and determine claims for labor done and materials furnished by the claimants under their contract with the defendant. If, on the review of all the facts in the case, the claimants have suffered injury for which they have received no compensation — a point upon which we express no opinion — Congress has reserved to itself the x>ower *338 of measuring tbe extent of the injury and of deciding whether it shall be compensated.
The plaintiffs’ petition must be dismissed.